**CLARK & WILKINS INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Shopmen's Local Union No. 455, et al., Intervenors.**

**No. 88–1602.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1989.

Decided Oct. 13, 1989.

Martin Gringer, Melville, N.Y., was on the brief, for petitioner.

Elliot J. Mandel, Melville, N.Y., also entered an appearance, for petitioner.

Judith A. Dowd, Attorney, N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel and Frederick Havard, Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent.

Joseph H. Bornong, Atty., N.L.R.B., Washington, D.C., also entered an appearance, for respondent.

Susan Martin was on the brief, for intervenors.

Before WALD, Chief Judge, and BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Clark & Wilkins Industries, Inc. ("Clark" or "Company"), petitions for review of a decision by the National Labor Relations Board ("NLRB" or "Board"), finding the company liable under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA" or "Act") for discharging Phillip Greene and Cecil Chinfloo for engaging in union activity, in violation of §§ 8(a)(1) and 8(a)(3) of the Act. We affirm the Board's decision and accompanying order.

## I. BACKGROUND [1]

Clark & Wilkins Industries, Inc. is a small general contracting firm located in New York City. The company consists of Jack Roth, its president, Walter Wardrop, its steel superintendent, two leadmen, including Uriel Brown and 15 crew members, including Phillip Greene and Cecil Chinfloo.

As steel superintendent, Wardrop is responsible for the fabrication of iron products in the company's shop. When the iron product is ready for installation, Wardrop takes a leadman to the installation site and tells him how the work is to be done. A complement of the company's crew is then assigned to work under the leadman at the jobsite. The leadman directs the work at the jobsite and is responsible for its proper completion. At the end of the day the leadman reports to Wardrop on both the progress made and problems encountered at the jobsite.

In the mornings, before heading out to jobsites, the crew members and the leadmen change into their work clothes in a locker room in the company's shop. In the evenings, they return to the locker room where they change back into their street clothes. On Fridays, the employees and the leadmen generally go to a bar together.

### A. *Greene's Discharge*

On January 30, 1985, Greene met with approximately eight of his fellow crew members in the company's locker room to discuss both the potential benefits of unionizing and the possibility of holding an election.[2] Chinfloo attended the meeting. Although the crew members generally left work at 4:30 P.M., they did not leave the locker room that day until about 5:10 P.M. Wardrop was standing at the door as they filtered out.

On January 31, Greene, Chinfloo and two other employees were assigned to a work crew under leadman Brown. The crew was instructed to put up a fence at a site near Central Park. Greene, Chinfloo and one other crew member worked on one part of the fence while Brown and the other crew member worked on another part.

In the afternoon, Wardrop visited the jobsite and inspected the work in progress. Before leaving, he spoke privately with Brown. Subsequently, Brown criticized Greene's and Chinfloo's work. Greene got angry and told Brown that he was "tired of being used" and that he would "take steps ... to change that." J.A. 69. Brown replied that "any steps or anything you guys are going to do do not include me." *Id.*

After returning to the locker room at the end of the day, Brown and Greene argued about Brown's criticism at the jobsite. As Brown left the locker room, Wardrop asked him what was the matter. Brown explained what happened at the jobsite and said he had thought the matter was closed until Greene reopened it in the locker room. The next morning, February 1, Wardrop dismissed Greene.[3]

---

1. The following facts were found by Administrative Law Judge ("ALJ") Morio, Joint Appendix ("J.A.") 12–33, and affirmed by the Board.

2. The union Greene discussed with the other crew members is Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Workers, AFL–CIO.

3. Greene testified that when Wardrop let him go, Wardrop told him that a big job was coming up and when it did he would be recalled, the implication being that his dismissal was the result of a temporary shortage of work. J.A. 74. While Judge Morio did not specifically credit this testimony, she did explicitly find that War-

## B. *Chinfloo's Discharge*

Chinfloo worked at various company jobsites and also drove a company truck. Chinfloo had recently immigrated from the West Indies and thus was unfamiliar with the city. On approximately February 4, Wardrop asked Chinfloo to pick up some debris at a company jobsite. Chinfloo did not know how to get to the jobsite and consequently had to follow Wardrop to the spot.

On February 6, Antonio Schifano, a union representative, met with Jack Roth in Roth's office. Schifano told Roth that several of Clark's employees had signed union authorization cards and asked Roth to begin bargaining with the union. Roth told Schifano that he could not afford a union but Schifano nonetheless persuaded Roth to meet him the next day to discuss the matter further. Later that day, Wardrop dismissed Chinfloo.[4] Subsequently, Roth cancelled his February 7 meeting with Schifano. Consequently, the union filed a petition for a representation proceeding with the Board on behalf of Clark's crew members.

## C. *The Representation Election*

On February 25, prior to the representation proceeding, the parties took part in a conference on the voting eligibility of Greene and Chinfloo. The company contended that Greene and Chinfloo were ineligible to vote because they had been discharged for cause. The union maintained that they had been unlawfully discharged and were thus eligible to vote. The Board then commenced a hearing on the status of Greene and Chinfloo, only to terminate it because the parties entered into an agreement allowing Greene and Chinfloo to vote subject to challenge. The election, in which Brown participated, was held on March 20, resulting in a 6–6 tie. The challenged ballots of Greene and Chinfloo were therefore determinative of the outcome of the election.

Before a hearing on the challenged ballots was held, the union filed the unfair labor practice charges at issue in this case, alleging that Greene and Chinfloo were unlawfully discharged. On July 9, the Board issued an order consolidating the hearing on the challenged ballots with the unfair labor practice hearing.

## D. *The Hearing Before the ALJ and the Board's Decision*

At the hearing before Judge Morio, Clark contended that Greene was fired for insubordination and Chinfloo for incompetence. Judge Morio disagreed, finding the company liable under §§ 8(a)(1) and 8(a)(3) of the Act because the union had shown, as required by *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced, NLRB v. Wright Line*, 662 F.2d 899 (1st Cir.1981), *cert. denied, NLRB v. Wright Line*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), that Greene's and Chinfloo's union activity were a motivating factor in Clark's decision to discharge them and Clark had failed to show that it would have discharged them notwithstanding their union activities.[5] In support of her decision, Judge Morio first found that the company, through leadman Brown, knew of Greene's and Chinfloo's union activity. The ALJ imputed Brown's

---

drop told Greene he was being laid off and did not tell him he was being discharged. J.A. 31.

**4.** Chinfloo testified that upon being dismissed, Wardrop told him that he was a good employee and would be recalled in a matter of weeks. Like Greene, the inference Chinfloo drew from this statement was that the layoff was the result of a temporary shortage of work. J.A. 105. Moreover, Chinfloo testified that Wardrop said nothing to him about his inability to find the jobsite on February 4. J.A. 107. As with Greene, Judge Morio did not specifically credit this testimony but did explicitly find that War-

drop told Chinfloo he was being laid off and did not tell him he was being discharged. J.A. 31.

**5.** Section 8 of the Act provides in relevant part:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; ...
(3) by discrimination in regard to hire or tenure of employment or any terms or conditions of employment to encourage or discourage membership in any labor organization. ...

knowledge to the company because she found Brown to be a company supervisor as defined by § 2(11) of the Act.[6]

Judge Morio also found that the timing of Greene's and Chinfloo's respective dismissals indicated that they were discharged for engaging in union activity. Finally, Judge Morio found evidence of Clark's hostility toward unions, indicating that the company was inclined to dismiss employees for engaging in union activity.

In a brief opinion, the Board affirmed the ALJ's "rulings, findings and conclusions." J.A. 45.[7]

## II. ANALYSIS

Clark argues that in finding for Greene and Chinfloo, the Board erred in both its factual and legal conclusions.

On factual grounds, Clark argues that the record lacks substantial evidence to support the Board's finding that the company dismissed Greene and Chinfloo for engaging in union activity. But even if there were substantial evidence to that effect, the company contends that the record shows Clark had legitimate reasons for firing Greene and Chinfloo.

On legal grounds, Clark argues that its due process rights were violated because the union's complaint did not allege that Brown is a supervisor within the meaning of § 2(11) of the Act and thus the company did not have notice that Brown's status was in issue. While Clark recognizes that this alleged defect in the union's complaint would have been harmless had Brown's employment status been fully and fairly litigated before Judge Morio, it asserts that it was not. Clark also contends that the

union was precluded from relitigating the status of Brown because the union's complaint did not allege that Brown is a supervisor and for purposes of the representation proceeding, the union and the company had stipulated Brown to be an eligible voter[8] and therefore by definition not a supervisor.

We will address each contention in turn.

### A. *Issues of Fact*

■ In evaluating the Board's factual findings, a reviewing court may not disturb the Board's conclusions where they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Under this standard, so long as the Board's findings are *reasonable*, they may not be displaced on review even if the court might have reached a different result had the matter been before it *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Notwithstanding Clark's assertion to the contrary, the Board's determination that Chinfloo and Greene were discharged for engaging in union activity was clearly reasonable.

### 1. Knowledge

■ The Board found company knowledge of Greene's and Chinfloo's union activity by imputing leadman Brown's knowledge to the company. It justified this imputation by concluding that Brown is a supervisor within the meaning of § 2(11) of the Act.[9]

---

**6.** Section 2(11) of the Act provides:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not merely routine or clerical in nature, but requires the use of independent judgment.

**7.** The Board's decision, however, does not explicitly address the ALJ's finding of anti-union animus.

**8.** While the company asserts that the parties stipulated Brown to be an eligible voter, Clark & Wilkins Brief at 29, there is no evidence in the record of this stipulation and the Board neither confirms nor contests its existence. However, the Board does confirm that Brown voted in the election. NLRB Brief at 23.

**9.** Clark rejects the Board's summary acceptance of Judge Morio's imputation of Brown's knowledge to the company, arguing that Brown is not

The Board's finding that Brown knew of Greene's union activity was based primarily on an eminently reasonable inference it made from the exchange that took place between Brown and Greene at the worksite after Brown criticized Greene's work. Brown's comment—"any steps or anything you guys are going to do do not include me"—clearly indicates that he understood Greene's remark—taking "steps"—to refer to his union activities. J.A. 69. If this were not the case, Brown would not have addressed his response to "you guys," since Greene protested Brown's criticism in the first-person singular: "*I'm* tired of being used" and "steps *I* would make to change that." *Id.* (emphasis added).

■ The Board also inferred from this exchange that Brown knew of Chinfloo's union activities because Chinfloo was on Brown's work crew that day. While we find this inference less well-founded—there was a third member of the work crew who was not subsequently fired—it was reasonable for the Board to conclude as it did. The evidence discussed below regarding the timing of Chinfloo's dismissal supports the Board's finding with regard to Chinfloo.[10]

### 2. Timing

■ The Board reasonably concluded that "[Clark's] asserted justification for Greene's discharge was trumped up from events occurring the very morning after his activity in support of the union—events which even Brown made clear he considered trivial, and which the ALJ found to be pretextual. Chinfloo's discharge occurred only hours after the respondent was confronted by the union with a demand for recognition." J.A. 47–48.[11]

Clark attempts to explain away these coincidences in timing primarily by attacking the credibility of the union's witnesses. In finding for the union, however, Judge Morio addressed the credibility issue and "under the law of [the D.C. Circuit], it is clear that Board-approved credibility determinations of an ALJ are entitled to be upheld unless they are 'hopelessly incredible or self-contradictory.'" *Teamsters v. NLRB,* 863 F.2d 946, 953 (D.C.Cir.1988), *cert. denied, A.G. Boone Co. v. NLRB,* —— U.S. ——, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989).[12]

a supervisor within the meaning of § 2(11) of the Act.

Even if Brown's employee status were a close call, as the Supreme Court has explained, "... the gradations of authority 'responsibly to direct' the work of others ... are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of supervisor." *Marine Engineers Beneficial Ass'n v. Interlake Steamship Co.,* 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 1240 n. 6, 8 L.Ed.2d 418 (1962) (quoting with approval from *NLRB v. Swift & Co.,* 292 F.2d 561, 563 (1st Cir.1961)).

10. The Board also invoked the "small shop" theory in finding that Brown knew of Greene's and Chinfloo's union activity. Under this theory, where a small company is at issue, evidence showing the small number of employees and the close working and social relationship between a company supervisor and its employees supports an inference of company knowledge of union activity. *See NLRB v. Health Care Logistics,* 784 F.2d 232, 236 (6th Cir.1986). Here, the Board recognized that "Brown ... spent a considerable amount of time with the *small complement* of unit employees both on and off the job." J.A. 47 (emphasis added).

11. The Board also relied on these findings in determining that Clark would not have dismissed Greene or Chinfloo absent their union activity. In reaching this conclusion, however, the Board also invoked Judge Morio's credibility determinations: "Having discredited Wardrop's confused and self-contradicting testimony and thus finding that his asserted reasons for the discharges were false, the judge properly inferred that the real reason was an unlawful one." J.A. 48. As noted below, this court must accord great deference to the ALJ's credibility determinations.

12. Moreover, as Judge Morio stated, deciding whom to believe about what in this case was particularly difficult:

All counsel agree that the case presents credibility issues, but each contends that the witnesses who testified in support of their position were completely trustworthy and it was the witness for the other side who slanted the truth. Unfortunately, the resolution of the credibility issue in this case is not simple. My observation of the demeanor of all the witnesses and my examination of the record convinces me that witnesses for both sides tended to tell only part of the truth.

J.A. 24.

## B. *Issues of Law*

The company asserts that its due process rights were violated because the union's complaint did not allege Brown to be a supervisor and because Brown's employee status was not fully and fairly litigated before the ALJ. We agree with the Board that Brown's status was fully and fairly litigated before Judge Morio. J.A. 46 n. 2. We will first discuss the alleged deficiency in the union's complaint.

▇▇▇ It is clear that the union's complaint was sufficient as measured by the Board's regulation governing the sufficiency of complaints. 29 C.F.R. § 102.15 requires a union to name in its complaint only those agents "by whom" a party is alleged to have committed unfair labor practices.[13] The union never contended that Brown committed any unfair labor practices. Rather, Brown was merely the conduit through whom the company's principals, Roth and Wardrop, learned of Greene's and Chinfloo's union activity. It was Roth and Wardrop who fired Greene and Chinfloo, thus it was Roth and Wardrop "by whom" the unfair labor practices at issue were committed. The union named both Roth and Wardrop in its complaint. J.A. 4. Moreover, Brown's employee status was fully and fairly litigated at the hearing and thus Clark had adequate notice that Brown's status was in issue.

As the Board points out, NLRB Brief at 12, not only was the issue of Brown's status litigated at the hearing, it was raised by the company. The company put both Brown and Wardrop on the stand in an effort to counter assertions by Greene that Brown had no authority over him. J.A. 70, 77, 78. The company's aim was to prove that since Greene was responsible to Brown, Greene's defiance of Brown both at the worksite and in the locker room constituted insubordination and was the reason for Greene's dismissal. The company's strategy backfired, however, as Brown's, J.A. 139–44, and Wardrop's, J.A. 158, testimony indicated that Brown is a supervisor.[14]

On its cross-examination of Brown, J.A. 188–91, and Wardrop, J.A. 165–71, 173–74, 182, the union took advantage of this opening, eliciting considerable testimony to support the conclusion that Brown is a supervisor.[15] Clark could have recalled Brown and Wardrop to rebut the evidence adduced by the union on cross-examination, but as it concedes, it did not take advantage of that opportunity. Clark & Wilkins Brief at 14.

Clark's contention that it did not recall its witnesses because "throughout the hearing General Counsel took the position that Brown was not even a leadman" is without merit. *Id.*

First, the record does not support this characterization of General Counsel's position. Second, and more important, given the nature of the allegations made by the union, Clark should have known that Brown's status might be litigated. By definition, to prevail on §§ 8(a)(1) and 8(a)(3) charges, a petitioner must prove company knowledge of union activity. The ebb and flow of examination and cross-examination would have made it clear to anyone familiar with §§ 8(a)(1) and 8(a)(3) actions that Brown's status was up for grabs.

But even if Clark remained blissfully ignorant of whose knowledge was being litigated, the General Counsel was not re-

---

13. 29 C.F.R. § 102.15 provides in relevant part:
   The complaint shall contain (a) a clear and concise statement of the facts upon which assertion of jurisdiction by the Board is predicated and (b) a clear and concise description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts and the names of respondent's agents or other representatives by whom committed.

14. For example, Brown testified that he was "totally responsible for" and "in charge of" the job to be performed. J.A. 140, 143. Wardrop testified that "in the work that we do, a leadman is a key man ... he runs the job for me." J.A. 158.

15. Brown testified that "I was supposed to supervise the jobs that I was on while I was out in the field." J.A. 188. Wardrop testified that "I hold all my leadmen responsible for the jobs," J.A. 174, and "the leadman runs the job and [employees] are to help him and assist the best [they] can." J.A. 182.

quired to announce at the hearing that the primary evidence it intended to adduce to prove company knowledge was the fact that Brown is a supervisor. Clark has not cited any cases holding that a party before the Board must tell its opponent what evidence it plans to use to prove its theory of liability.[16]

■ Finally Clark asserts that the Board gave an incomplete statement of the law when it affirmed Judge Morio's reconsideration of Brown's employment status.[17] According to Clark, the law precluded both the ALJ and the Board from reconsidering Brown's status because "whe[n] an individual is found to be an employee in a representation proceeding, the question of his status may be relitigated in an unfair labor practice proceeding *only where* there is a specific allegation in the complaint that the employee is a supervisor and is alleged to have committed unfair labor practices." Clark & Wilkins Brief at 28–29 (emphasis added).[18] This proposition merits little dis-

---

16. The cases the company cites in support of its argument that Brown's status was not fully and fairly litigated are inapposite.

In *G.W. Galloway Co. v. NLRB,* 856 F.2d 275 (D.C.Cir.1988); *International Association of Bridge, Structural, Ornamental Iron Workers, AFL–CIO Local No. 111 v. NLRB,* 792 F.2d 241 (D.C.Cir.1986); *Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 778 F.2d 8 (D.C.Cir.1985); *Amalgamated Meat Cutters & Butcher Workmen v. NLRB,* 663 F.2d 223 (D.C.Cir.1980); and *Rodale Press, Inc. v. FTC,* 407 F.2d 1252 (D.C.Cir. 1968), this court overturned the Board for grounding its finding of liability in a *theory* other than that alleged by petitioner. In *Galloway,* this court overturned the Board for issuing a complaint to the employer because the employer had unlawfully coerced striking workers to return to work where petitioner's *theory* of liability was that an employee had been unlawfully discharged. In *Road Sprinkler,* we overturned the Board for grounding its finding of liability in the *theory* that the company had unlawfully failed to rehire where the union's *theory* of liability was unlawful discharge. In *International,* the Board found liability on both *theories* of direct and indirect coercion where the union's complaint had alleged only, and in great detail, direct coercion. In *Amalgamated,* we reversed the Board for grounding liability in the *theory* that the employer failed to notify the union that it was going out of business where the union had relied on the *theory* that the employer never ceased doing business by continuing to operate through its alter ego. In *Rodale,* we overturned the Board for grounding liability in the *theory* that the advertising in issue misrepresented the contents of the book where petitioner's *theory* was that the misleading advertisements repeated misleading health tips given in the book. Here the union's *theory* is, and has always been, that the company discharged Greene and Chinfloo because it had knowledge of their union activity. Brown's su-pervisory status is only *evidence* to prove the theory of liability, not a theory of liability in and of itself.

In *NLRB v. Blake Construction,* 663 F.2d 272 (D.C.Cir.1981), we reversed the Board because it had imposed additional liability on Blake for its unlawful dealings with employees that Blake had no idea were in issue. Here, Clark knew from the outset that Greene and Chinfloo were contesting their respective discharges. In *Conair v. NLRB,* 721 F.2d 1355 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984), we reversed the Board for grounding liability in a § 8(a)(3) violation where the petitioner originally alleged only a § 8(a)(1) violation.

17. In upholding Judge Morio's determination that Brown is a supervisor, the Board said: "Failure to request review of a Regional Director's approval of a stipulation for a consent election has preclusive effect only to *related* subsequent unfair labor practice proceedings (*i.e.,* § 8(a)(5) refusal-to-bargain cases), and [ ] subsequent unfair labor practice proceedings involving § 8(a)(1) and § 8(a)(3) such as the instant proceeding are not related unfair labor practice proceedings." J.A. 46 n. 2 (emphasis added).

The controversy over what is a "related" proceeding was spawned by the Board's issuance, in 1966, of the following regulation:

Section 102.67(f): Failure to request review [of a Regional Director's consent to an election stipulation] shall preclude such parties from relitigating, in any *related* subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding.

(Emphasis added.)

18. The Company does not explicitly state that Brown was found to be a nonsupervisory employee for purposes of the election but the im-

cussion, as two of the cases Clark cites in support undermine its argument and the third is unhelpful.

For example, it cites *Reeves Bros.*, 277 N.L.R.B. 1568, 1573 n. 3 (1986), where the ALJ found that because as here, the unfair labor practice proceeding contained issues "unrelated to issues in the representation case, the status of the leadman is the proper subject of relitigation."

Clark also cites *Herb Kohn Electric Co. v. NLRB*, 272 N.L.R.B. 815 n. 5 (1984), which reads in relevant part: "It is well established that, *even where* an individual has been found in a representation proceeding to be an employee, the question of his or her status may be litigated in a subsequent unfair labor practice proceeding, particularly where, as here, there is a specific allegation that the individual is a supervisor.... *Hedison Manufacturing Co.*, 249 N.L.R.B. 791 (1980)." (Emphasis added). In other words, according to the NLRB, while an allegation of supervisory status is helpful, it is by no means necessary.

Finally, Clark cites *Hedison Manufacturing Co.*, 249 N.L.R.B. 791 (1980). In that case, the Board found it unnecessary to make a determination of the status of the employee in issue. And while the Board did say, in *dictum,* that the Board's rules prohibit relitigation of the employee's status *"especially* since general counsel's request for a bargaining order raises essentially the issue of the scope and composition of the appropriate unit which would not be relitigated in a § 8(a)(5) case...." *Hedison* at 800 (emphasis added), it erred in using the word "especially"; the word it should have chosen was "only."

Indeed, *subsequent* Board decisions such as *Reeves* and *Herb Kohn* have recognized, as shown, that relitigation of an employee's status is not precluded in §§ 8(a)(1) and 8(a)(3) proceedings, where the issue being relitigated is "unrelated" to the prior representation proceeding. In fact, the Board's decision in this case explicitly holds that §§ 8(a)(1) and 8(a)(3) proceedings are "unrelated" to representation proceedings. In so holding, it cited this court's opinion in *Amalgamated Clothing Workers of America v. NLRB*, 365 F.2d 898, 904-05 (D.C. Cir.1966), where the court made the same point. *See also NLRB v. Hydro Conduit Co.*, 813 F.2d 1002, 1003 (9th Cir.1987) ("The circuit courts that have addressed the issue have concluded that § 102.67(f) does not prevent relitigation in a subsequent §§ 8(a)(1) or 8(a)(3) unfair labor proceeding of issues that were or could have been raised in a representation proceeding.").[19]

## III. CONCLUSION

Substantial evidence on the record as a whole supports the Board's finding that Clark unlawfully discharged Greene and Chinfloo for engaging in union activity, in violation of §§ 8(a)(1) and 8(a)(3) of the Act. The record also shows that Brown's supervisory status was fully and fairly litigated before Judge Morio. Finally, the Board was correct in concluding that Judge Morio was not precluded from revisiting Brown's employment status, notwithstanding the fact that Brown voted in the prior representation proceeding. *Herb Kohn Electric Co. v. NLRB*, 272 N.L.R.B. 815 (1984). We therefore affirm the Board's decision and

plication is obvious. Moreover, it is correct. While the record does not show that Brown was found to be an employee for purposes of the election, the Board has explained that it is "axiomatic that ... the Board will not find a statutory supervisor to be eligible to vote in a Board election." *Superior Bakery, Inc.*, 294 N.L.R.B. No. 21, p.2 (1989). And as this court has noted, § 2(3) of the NLRA defines "employee" so as to expressly exclude "any individual employed as a supervisor." *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 438 n. 10 (D.C.Cir.1972).

**19.** The company finally asserts that Judge Morio's quashing of its subpoena seeking all of its employees' signed authorization cards constituted prejudicial error. Clark & Wilkins Brief at 32, 39. It contends that offering all the signed cards as evidence would have proven that it fired Greene and Chinfloo for cause because it did not fire all of its employees that wanted to unionize.

But an employer's discriminatory motive is not disproved by evidence showing that "it did not weed out all union adherents." *Nachman Corp. v. NLRB*, 337 F.2d 421, 424 (7th Cir.1964).

accompanying order.[20]  Consequently, the petition for review is

*Denied.*

**20.** As ordered by the Board, Clark must *cease and desist* from the unfair labor practices found, offer Greene and Chinfloo reinstatement in their former or substantially equivalent positions, make them whole for any loss of earnings they suffered by reason of discrimination against them and expunge from its files any references to their discharges. Additionally, the NLRB's Regional Director must open and count the ballots cast by Greene and Chinfloo in the representation proceeding. *See* J.A. 42; 32–33.