**LARO MAINTENANCE CORPORATION,**
**Petitioner**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent,**

**Service Employees International Union,**
**AFL–CIO, Intervenor.**

No. 94–1064.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 2, 1995.

Decided June 9, 1995.

Suggestion for Rehearing In Banc
Denied Aug. 16, 1995.

Clifford P. Chaiet, Jericho, NY, argued the cause and filed the briefs, for petitioner.

Joseph A. Oertel, Senior Litigation Atty., N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Linda R. Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Dep-

uty Asst. Gen. Counsel, N.L.R.B., Washington, DC.

Ira A. Sturm, New York City, entered an appearance, for intervenor.

Before WALD, RANDOLPH, and ROGERS, Circuit Judges.

Dissenting opinion filed by Circuit Judge RANDOLPH.

ROGERS, Circuit Judge:

Laro Maintenance Corporation petitions for review of the decision and order of the National Labor Relations Board finding that Laro had violated §§ (8)(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by discriminating against certain applicants for employment based on their union membership. *Laro Maintenance Corp.*, 312 N.L.R.B. 155, 1993 WL 371437 (1993). Specifically, Laro contends that the Board impermissibly presumed anti-union animus and lacked substantial evidence to support its finding of discriminatory intent. Because the Board applied the appropriate legal standard and substantial evidence in the record considered as a whole supports its determination that Laro's failure to hire any of the thirteen applicants was based on their union membership, we deny the petition for review and grant the Board's cross-petition for enforcement.

## I.

For about six years ending on September 30, 1990, Prompt Maintenance Services, Inc. cleaned and maintained the federal government building at 225 Cadman Plaza in Brooklyn, New York under a contract with the General Services Administration ("GSA"). Prompt employees performed this work under a collective bargaining agreement between Prompt and Local 32B–32J, Service Employees International Union, AFL–CIO ("Local 32B"). In April 1990, the GSA solicited bids for a new cleaning contract at Cadman Plaza. The bid solicitation required the new contractor to pay the same wages as Prompt and to have an initial work force of which at least fifty percent comprised experienced cleaners. Laro was awarded the contract to begin October 1, 1990.

On or about September 17, 1990, Local 32B requested that Laro hire Prompt's Cadman Plaza employees. On September 18, Laro's President, Robert Bertuglia, toured the Cadman Plaza building. A GSA official mentioned the names of various employees as being "good workers," and Bertuglia observed two Prompt employees sleeping. Bertuglia did not take note of the names of either the good workers or the sleeping workers. After the inspection, the building manager (another GSA employee) informed Bertuglia that the GSA had taken deductions from Prompt's fee, presumably for deficient performance.[1] Bertuglia told the building manager that he did not intend to hire any of Prompt's employees because of the deductions and the two employees he had seen sleeping on the job. The building manager informed Bertuglia that certain judges whose chambers were in the Cadman Plaza building wanted Laro to retain the Prompt employees who cleaned their chambers. The building manager also advised Bertuglia to interview all Prompt employees and stated that it would be advantageous for Laro to hire as many of them as possible. Several days later, the GSA official who conducted the inspection gave Bertuglia a list of ten "better cleaners from Prompt Maintenance," and urged Laro to hire them.

Despite Bertuglia's stated desire not to hire any Prompt employees, Laro agreed to hire the ten Prompt employees on the GSA's list. Laro accepted applications from other Prompt employees but had already decided that it would not hire any of them; consequently Laro asked the Prompt employees who were not on the GSA's list virtually no questions about their background or experience and did not seek information about individual Prompt employees who had good work records and had worked at Cadman Plaza for a number of years for Prompt and its predecessor. Instead, to complete its Cadman Plaza work force, Laro hired eight workers who had not previously worked for Prompt.

---

1. Apparently, Bertuglia was neither informed of, nor inquired about, the reasons for or extent of the deductions or which employees were responsible.

Laro had previously employed four of these workers. Two had good work records and requested transfers to Cadman Plaza. Laro transferred the other two to Cadman Plaza at least in part because of their poor performance at Laro's Jamaica, New York site: Laro had discharged one for poor attendance and insubordination three weeks before it hired her to work at Cadman Plaza, and transferred the other because he required constant supervision, did not get his work done, made frivolous excuses for his failure to complete tasks, and constantly complained. Laro also hired four workers who had not previously been employed by either Prompt or Laro. Laro admitted that three of them had no relevant work experience, and although the fourth worker listed factory and office cleaning as relevant experience on his application, he did not list any positions at which he would have gained such experience. On September 28, 1990, just before commencing work at Cadman Plaza under its contract with GSA, Laro entered into a supplemental agreement with Amalgamated Local Union 355 ("Local 355")—with which Laro had a collective bargaining agreement (August 1, 1990, through July 1, 1993) for its employees in Jamaica, New York—covering its employees at Cadman Plaza.

Thereafter, Local 32B filed an unfair labor practice charge against Laro. The Board's General Counsel filed a complaint, alleging violations of §§ 8(a)(1), (2), (3), and (5) of the Act on the ground that Laro had bargained with Local 355 knowing that it represented a minority of the workers at Cadman Plaza and that it had refused to consider employing Prompt employees, other than those on the GSA's list, because of their union membership. When these charges came before an Administrative Law Judge ("ALJ") for a hearing, Laro admitted that it had recognized Local 355 although Local 32B represented a majority of the employees at Cadman Plaza; the Board entered into an infor-

mal settlement agreement with Laro whereby Laro agreed to recognize Local 32B for its Cadman Plaza employees, thus disposing of the alleged violations of §§ 8(a)(2) and (5). Following a hearing on the remaining complaint allegations, the ALJ concluded that Laro violated §§ 8(a)(1) and (3) upon finding that Laro had declined to consider any Prompt employees who were not on the "better cleaners" list in order to recognize and bargain with Local 355 rather than Local 32B. The Board adopted the ALJ's findings and conclusions with minor modifications and ordered Laro to offer employment and back pay to the Prompt employees it had refused to consider.[2] Laro petitioned for review under 29 U.S.C. § 160(f), and the Board cross-petitioned for enforcement under 29 U.S.C. § 160(e).

## II.

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "to encourage or discourage membership in any labor organization," "by discrimination in regard to hire or tenure of employment or any term or condition of employment...." 29 U.S.C. § 158(a)(3).[3] Under this section, a successor employer not the alter ego of its predecessor is not obligated to hire its predecessor's employees. *Howard Johnson Co. v. Hotel & Restaurant Employees Int'l Union,* 417 U.S. 249, 259 n. 5, 261, 94 S.Ct. 2236, 2242 n. 5, 2243, 41 L.Ed.2d 46 (1974) (quoting *NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1579 n. 5, 32 L.Ed.2d 61 (1972)). However, "a new owner [can]not refuse to hire the employees of [its] predecessor solely because they were union members or to avoid having to recognize the union." *Id.* at 262 n. 8, 94 S.Ct. at 2243 n. 8; *see Great Lakes Chem. Corp. v. NLRB,* 967 F.2d 624, 627 (D.C.Cir.1992).

---

**2.** The ALJ found that Laro failed to hire thirteen Prompt employees because of their union affiliation. Because Laro used a smaller workforce than Prompt, the Board left to the compliance stage of the proceedings the issue of which unemployed employees are entitled to reinstatement and back pay. *See Great Lakes Chem. Corp. v. NLRB,* 967 F.2d 624, 630 (D.C.Cir.1992).

**3.** Such conduct also violates § 8(a)(1) of the Act because it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" their labor rights. 29 U.S.C. § 158(a)(1); *see Power Inc. v. NLRB,* 40 F.3d 409, 417 n. 3 (D.C.Cir.1994).

■ When a violation of § 8(a)(3) is alleged, the Board applies the two-stage causation test established in *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in *NLRB v. Transportation Mgt. Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).[4] Under *Wright Line*, the Board's General Counsel bears the initial burden to "make a *prima facie* showing sufficient to support the inference that protected [*i.e.*, legitimate, union-related] conduct was a 'motivating factor' in the employer's decision" to take adverse employment action. *Wright Line*, 251 N.L.R.B. at 1089. The employer may then rebut the inference by showing by a preponderance of the evidence that "the same action would have taken place even in the absence of the protected conduct." *Id.;* see *Transportation Mgt.*, 462 U.S. at 399, 103 S.Ct. at 2473; *Power Inc. v. NLRB*, 40 F.3d 409, 417 (D.C.Cir.1994).[5]

Laro contends that the Board violated the legal standard articulated in *Howard Johnson Co.* by presuming anti-union animus from the fact that Laro decided not to consider any Prompt employee who was not on the "better cleaners" list. If applied, such a presumption would be contrary to the *Howard Johnson Co.* rule allowing a subsequent employer to refuse to hire its predecessor's employees, and involve a misapplication of § 8(a)(3). However, no fair reading of the Board's decision indicates that the Board applied such a presumption. To the contrary, the Board concluded that Laro violated § 8(a)(3) not simply because Laro failed to consider any of the thirteen Prompt employees, but because its motive in doing so was "to avoid an obligation to bargain with Local 32B." *Laro Maintenance Corp.*, 312 N.L.R.B. at 155 n. 2. The Board based this finding in part on Laro's refusal to consider these Prompt employees, but also on additional evidence of Laro's antipathy to Local 32B, including the poor quality of workers Laro actually did hire, Laro's hiring practices at other union and non-union sites, and Laro's admitted unfair labor practice of recognizing Local 355 instead of Local 32B at the Cadman Plaza site. The Board also conducted the second prong of the *Wright Line* analysis and rejected Laro's position that it would have refused to hire these predecessor employees regardless of its antipathy to Local 32B because of what Laro viewed as poor performance by Prompt and a need to start fresh with new employees. This analysis would have been unnecessary had the Board embraced the erroneous legal premise attributed to it by Laro, namely that the Act prohibited Laro from refusing to consider hiring Prompt employees, regardless of its motive for doing so. Instead, the Board correctly recognized that it had to determine Laro's motivation for its action, based on the action itself and other evidence.

### III.

■ Laro's second contention presents a closer question, at least for the Board if not the court. Laro contends that the Board's finding of a *prima facie* case, that Laro's failure to hire any of the thirteen Prompt employees was motivated by its desire to avoid bargaining with Local 32B, is unsupported by substantial evidence. Similarly Laro contends that substantial evidence does not support the Board's rejection of Laro's claim under the second prong of *Wright Line* that it would have hired the same employees regardless of the Prompt employees' union membership. The court's review of the Board's factual conclusions is highly deferential, upholding a decision if it is supported by substantial evidence considering the record

4. See *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, —— U.S. ——, ——–——, 114 S.Ct. 2251, 2257–58, 129 L.Ed.2d 221 (1994) (rejecting footnote in *Transportation Mgt.* while reaffirming its holding).

5. The instant appeal differs from *Wright Line* and *Transportation Mgt.* to the extent that those cases involved discriminatory discharges, rather than failures to hire. *Transportation Mgt.*, 462 U.S. at 394, 103 S.Ct. at 2470; *Wright Line*, 251 N.L.R.B. at 1089. The same legal principles are no less applicable to failures to hire, however, because § 8(a)(3) forbids any "discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3); *see Howard Johnson Co.*, 417 U.S. at 262 n. 8, 94 S.Ct. at 2243 n. 8; *Power Inc.*, 40 F.3d at 417, 419–20.

as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Power Inc.*, 40 F.3d at 417; *Union–Tribune Publishing Co. v. NLRB*, 1 F.3d 486, 491 (7th Cir.1993); 29 U.S.C. § 160(e). "So long as the Board's findings are *reasonable*, they may not be displaced on review even if the court might have reached a different result had the matter been before it *de novo.*" *Clark & Wilkins Indus., Inc. v. NLRB*, 887 F.2d 308, 312 (D.C.Cir.1989), *cert. denied*, 495 U.S. 934, 110 S.Ct. 2177, 109 L.Ed.2d 505 (1990); *see Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465; *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985).

■ The court's review of the Board's determination with respect to motive is even more deferential. Motive is a question of fact that may be inferred from direct or circumstantial evidence. *Power Inc.*, 40 F.3d at 418; *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1168 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994); *Great Lakes Chem. Corp.*, 967 F.2d at 627. In most cases only circumstantial evidence of motive is likely to be available. *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 439 (D.C.Cir.1972); *NLRB v. Vought Corp.—MLRS Sys. Div.*, 788 F.2d 1378, 1382 (8th Cir.1986); *Intermountain Rural Elec. Ass'n v. NLRB*, 732 F.2d 754, 759 (10th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984); *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 339 (5th Cir.1980); *NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir.1978). Drawing such inferences from the evidence to assess an employer's hiring motive invokes the expertise of the Board, and consequently, the court gives "substantial deference to inferences the Board has drawn from the facts," including inferences of impermissible motive. *Gold Coast Restaurant Corp. v. NLRB*, 995 F.2d 257, 263 (D.C.Cir.1993); *Sheet Metal Workers' Int'l Ass'n AFL–CIO v. NLRB*, 989 F.2d 515, 521 (D.C.Cir.1993); *Lippincott Indus., Inc. v. NLRB*, 661 F.2d 112, 116 (9th Cir. 1981); *Pay'n Save Corp. v. NLRB*, 641 F.2d 697, 702 (9th Cir.1981).

The Board relied principally on three factual findings for its determination that Laro's motive for failing to hire any of the thirteen Prompt employees was its desire to avoid bargaining with Local 32B: (1) Laro's admitted unfair labor practice of recognizing Local 355 as the representative of employees at Cadman Plaza when a majority of those employees were members of Local 32B; (2) Laro's hiring practices at other sites that reveal anti-union bias; and (3) the pretextual nature of Laro's explanations for its actions. Because there is substantial evidence of record to support these findings and the Board's inference is reasonable, the court has no basis to conclude that the Board erred.

■ From the time Laro took over the Cadman Plaza site until the hearing before the ALJ—a period of nineteen months— Laro engaged in an unfair labor practice by recognizing Local 355 as the collective bargaining representative of the Cadman Plaza workers even though Laro knew that a majority of Laro's Cadman Plaza employees (ten of eighteen) were members of Local 32B. In addition, the Board adopted the ALJ's finding that Laro knowingly engaged in this unfair labor practice and actively attempted to conceal it. The Board found that a Laro supervisor told one of Laro's employees at the Jamaica site, Sebatine Acosta, that Laro was being sued by another union and needed two Jamaica employees to tell the Board that they also worked at Cadman Plaza. Laro instructed Acosta to inform the Board that he had worked at Cadman Plaza for an entire month when, in fact, he had only worked there one night. Laro's bad faith recognition of Local 355 rather than Local 32B, followed by Laro's attempt to conceal its unfair labor practice, presented the Board with substantial evidence that Laro's motive in failing to hire any of the Prompt employees was to avoid bargaining with Local 32B. The Board could properly consider this unfair labor practice in determining Laro's motive for its contemporaneous failure to hire the Prompt employees. *See Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 252 (D.C.Cir.1991); *NLRB v. Q–1 Motor Express, Inc.*, 25 F.3d 473, 478 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995).

Laro's contention that once it hired former Prompt employees as a majority of its Cadman Plaza work force, it had no further incentive to discriminate against Local 32B members, is undermined by its own action. Because the majority of Local 32B members at Cadman Plaza was so small (ten of eighteen), the addition of two individuals to the unit would destroy Local 32B's majority status, and Laro attempted, through Acosta and his supervisor, to accomplish this goal. Had Laro hired additional former Prompt employees, it could not as easily conceal the Local 32B majority. The instant case is thus similar to *Great Lakes Chem. Corp.*, where the employer unsuccessfully made the same argument based on having hired a "core group" of incumbent employees and then attempting to fill the remaining positions with unskilled trainees. 967 F.2d at 627–28. In rejecting the employer's contention that its hiring of union members belied any impermissible motive on its part, the court noted circumstances similar to those in the instant case, namely that the employer had attempted to keep the union out and had succeeded in delaying the recognition of the union as the bargaining representative. *Id.* at 628. The fact that the employer in *Great Lakes Chem. Corp.*, like Laro, hired enough members of the union to constitute a majority of the work force did not establish the absence of impermissible motive. *Id.* at 629.

As further evidence of impermissible motive, the Board relied on Laro's employment decisions at other cleaning contract sites. Of the three sites where Laro acquired the cleaning contract, including Cadman Plaza, two were unionized under the previous employer and one was not. Laro attempted to avoid hiring any of the incumbent employees at both unionized locations but willingly hired one-third of the incumbent employees at the non-union location.[6] These actions undermine Laro's claim that its reasons for limiting its hires of Prompt employees were related to performance; there is no performance-based rationale for the disparate treatment of incumbent employees at unionized and

non-unionized sites in the absence of record evidence regarding employee quality. The Board's inference that this disparate treatment was based on union membership is thus based on substantial evidence and provides further evidence of unlawful motive for Laro's refusal to hire any of the thirteen Prompt employees. *See Gold Coast,* 995 F.2d at 264–65 (disparate treatment of individuals similarly situated except for protected activity may constitute substantial evidence of violation of §§ 8(a)(1) and (3)).

■ Finally, the Board determined that Laro's explanation for its refusal to consider the applications of the thirteen Prompt employees was pretextual. Although Laro was not obliged to offer any explanation for its actions, *see Howard Johnson Co.,* 417 U.S. at 261–62, 94 S.Ct. at 2242–43, the Board has held that a "case of discriminatory motivation may be supported by consideration of the lack of any legitimate basis for a respondent's actions." *Weco Cleaning Specialists, Inc.,* 308 N.L.R.B. 310, 310 n. 4, 1992 WL 206968 (1992); *Wright Line,* 251 N.L.R.B. at 1088 n. 12. This is especially true when the employer presents a legitimate basis for its actions which the factfinder concludes is pretextual. In such cases, the factfinder may not only properly infer that there is some other motive, but "that the motive is one that the employer desires to conceal—an unlawful motive—at least where . . . the surrounding facts tend to reinforce that inference." *Shattuck Denn Mining Corp. v. NLRB,* 362 F.2d 466, 470 (9th Cir.1966); *see also Q–1 Motor Express,* 25 F.3d at 479; *Union–Tribune,* 1 F.3d at 490–91; *Holo–Krome v. NLRB,* 954 F.2d 108, 113 (2d Cir.1992); *cf. Union–Tribune,* 1 F.3d at 491 ("A finding of pretext, *standing alone,* does not support a conclusion that a[n employment action] was improperly motivated.") (emphasis added).

■ Laro maintains that it refused to consider employing any Prompt employees who were not on the GSA's recommended list for two related legitimate reasons. First, Laro claims that it wanted to start work with

---

**6.** In both union locations, Laro was either strongly encouraged or required to hire incumbent workers, and it did so. However, this does not negate the evidence of animus apparent in

Laro's desire to hire no incumbents at these locations, compared with its uncoerced decision to hire one-third of the incumbent employees at the non-union site.

"fresh" employees, untainted by different methods that may have been used by Prompt or bad habits acquired during previous employment at Cadman Plaza. Second, Laro points out that it knew that Prompt employees had performed inadequately based on the deductions from Prompt's fees and Bertuglia's observation of two Prompt employees sleeping on the job. Laro correctly maintains that the Board, albeit on distinguishable records where the factfinder credited the proffered explanation, has previously found similar reasons sufficient defenses to allegations of discriminatory actions. *See Wolf Street Supermarkets, Inc.*, 264 N.L.R.B. 1124, 1129–30, 1982 WL 23783 (1982) (failure to hire any of predecessor's employees justified by predecessor's negative cash flow and poor appearance as well as the desire to present a new image to customers); *Great Plains Beef Co.*, 241 N.L.R.B. 948, 972–73, 1979 WL 8981 (1979) (preference for inexperienced employees is not, in and of itself, unreasonable or indicative of an unlawful motive). However, assertions of a legitimate business reason for preferring inexperienced workers can be overcome by evidence that an anti-union motive influenced the decision to exclude experienced employees. *Power Inc.*, 40 F.3d at 419, 420; *Inland Container Corp.*, 275 N.L.R.B. 378, 385–87, 1985 WL 45679 (1985); *Great Plains*, 241 N.L.R.B. at 973.

The Board's rejection of Laro's proffered business reasons for refusing to consider any of the thirteen Prompt employees is supported by substantial evidence. Both proffered reasons stem from Laro's alleged desire to hire workers who would perform best. Yet the record and Laro's actions belie such an intent on Laro's part. Laro transferred one worker from Jamaica to Cadman Plaza because of his poor work and need for constant supervision, and it hired another worker who had recently been fired from the Jamaica site for absenteeism and insubordination. Laro also hired at least three workers for Cadman Plaza with no relevant experience, rather than attempting to determine who among Prompt's experienced employees were sleeping on the job or responsible for the deductions (whose nature, extent and causes were unknown to Laro). None of

these actions comports with a desire to employ only the most productive workers.

Most telling is Laro's treatment of two individuals who sought employment during the week before Laro took over the Cadman Plaza contract. One former Prompt employee, Luis Quebrada, requested his old job back at Cadman Plaza, while a former Laro employee, Yonette Mathurin, who had been fired by Laro, requested her old job back at the Jamaica site. Laro hired both, but instead of giving them their requested assignments, it told Quebrada that no positions were left at Cadman Plaza and he would have to work at the Jamaica site, while informing Mathurin precisely the opposite, that no job was available at the Jamaica site but she could work at Cadman Plaza.

Based on this evidence, the Board drew the reasonable inference that Laro's explanations for not hiring any of the thirteen Prompt employees were pretextual. A desire for better quality employees does not explain Laro's hiring of demonstrably poor employees, rather than making any attempt to determine the quality of Prompt's experienced employees. Nor does Laro's explanation elucidate why Laro would allow the former Prompt employee, Quebrada, to work only at the Jamaica site, while permitting the former Laro employee, Mathurin, to take a job only at Cadman Plaza. Laro's desire to exclude Prompt employees from the Cadman Plaza site because of their union membership explains all of these actions.

■ Laro has offered the ALJ, the Board, and the court innocent explanations for virtually all of the evidence from which the Board inferred impermissible motive. For example, Laro explained that it assigned its two previous employees with poor records to Cadman Plaza because one would do better work for the supervisor at Cadman Plaza than he did for the supervisor at Jamaica and the other, who had been fired, repeatedly entreated her supervisor for reinstatement until he agreed to give her a second chance. However, the Board was not required to credit these explanations, *see Power Inc.*, 40 F.3d at 419, 420; *Davis Supermarkets*, 2 F.3d at 1167–68, 1170; *Great Lakes*, 967 F.2d at 629; *Inland Container*, 275 N.L.R.B. at 386, and specifi-

cally declined to overturn the ALJ's evaluations because it was not convinced by "the clear preponderance of all the relevant evidence ... that they [were] incorrect." *Laro Maintenance Corp.*, 312 N.L.R.B. at 155 n. 1. One component of the Board's determination that Laro's explanation for its actions was pretextual is the Board's view of Bertuglia's credibility. *See, e.g., id.* at 161, 162. "[T]he ALJ's credibility determinations, as adopted by the Board, will be upheld unless they are patently insupportable." *Gold Coast*, 995 F.2d at 265; *Williams Enterprises, Inc. v. NLRB*, 956 F.2d 1226, 1232 (D.C.Cir.1992); *see also Power Inc.*, 40 F.3d at 418. Consistent with the applicable standard of review, even if the court concluded that Laro's explanations were reasonable, the court would nevertheless uphold the Board's inferences as supported by substantial, if not overwhelming, evidence. *See Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459 (substantial evidence is "more than a mere scintilla"; it means "such evidence as a reasonable mind might accept as adequate to support a conclusion") (citation omitted). We therefore conclude that the first prong of *Wright Line* was satisfied; substantial evidence supports a *prima facie* case that Laro failed to consider or hire any of the thirteen Prompt employees because of its desire to avoid recognizing and bargaining with Local 32B in violation of §§ 8(a)(1) and (3).

Laro fares no better under the *Wright Line* test's second prong. *See Transportation Mgt.*, 462 U.S. at 399, 400, 402, 103 S.Ct. at 2473, 2474; *Wright Line*, 251 N.L.R.B. at 1089. Laro asserted the affirmative defense that even in the absence of impermissible motivation, it would have made the same hiring decisions and declined to hire any of the thirteen Prompt employees. Specifically, Laro maintains that it would have hired the eight non-incumbent employees whom it did hire because of its legitimate desire for workers who had experience working for Laro or who were recommended by a person with such experience. The ALJ concluded that Laro failed to prove that any of the thirteen Prompt employees would not have been hired absent Laro's impermissible motivation. The Board agreed, noting that Laro had failed to offer

any legitimate reason for refusing to interview or consider the pool of experienced employees. The Board's rejection of Laro's argument is based on substantial evidence. As noted, the Board rejected Laro's claim that it legitimately preferred workers previously employed by Laro because two of those workers had demonstrated their inability to work under Laro's system. Similarly, the Board rejected Laro's claim that it legitimately preferred inexperienced workers recommended by Laro employees because the Board found that this preference was applied disparately to union members and was therefore a pretext for discrimination based on union membership.

Thus, the Board's determination that Laro refused to hire any of the thirteen former Prompt employees because of their union membership is supported by substantial evidence in the record considered as a whole, including Laro's predetermination not to hire any more Prompt employees than GSA required, its disparate treatment of union-represented employees, its admitted contemporaneous unfair labor practice, and the absence of a legitimate reason for refusing to consider or make inquiries about the thirteen Prompt employees while hiring inexperienced employees and employees with poor work records. Accordingly, we deny the petition for review and grant the Board's petition for enforcement.

RANDOLPH, Circuit Judge, dissenting:

The Board's decision in this case makes no sense. Prompt's 23 employees had been doing a lousy job cleaning Cadman Plaza and Laro knew it, not only from GSA's report but also from observing two of Prompt's employees sleeping on the job. When Laro took over, it decided to streamline operations, thinking it could do a better job with 5 fewer workers. Yet according to the Board, Laro had a legal obligation to fill its 18 slots with the former Prompt employees. Why? Because, according to the Board, the only reason Laro did not hire all its employees from the Prompt pool was Laro's anti-Local 32B animus. There is no substantial evidence, indeed there is no evidence whatever, to support the Board's conclusion—a conclusion

that entails the utterly ridiculous proposition that but for the Prompt employees' membership in Local 32B, Laro would have hired them.

Too bad for Laro that it did not stick to its initial plan of not hiring any of Prompt's 23 employees. Had Laro done so in light of what it learned from GSA, no unfair labor practice charge could possibly have stuck. The labor laws do not require new employers to keep any of their predecessor's workers on board, so long as the new employer does not refuse to hire them "solely" because they belong to a union. *Howard Johnson Co. v. Hotel & Restaurant Employees Int'l Union*, 417 U.S. 249, 262 n. 8, 94 S.Ct. 2236, 2243 n. 8, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1579 n. 5, 32 L.Ed.2d 61 (1972). But at GSA's urging, Laro caved in and retained 10 Prompt employees, designated by GSA as the best of the bunch. The remaining 13 Prompt employees were thus necessarily the worst of the lot, or at least Laro was entitled to so believe. Laro harbored no anti-union animus in filling 10 of its 18 positions—a majority—with Prompt workers, all of whom were members of Local 32B. How then can it be that Laro violated § 8(a)(3), 29 U.S.C. § 158(a)(3), by not hiring more? (Actually, Laro did hire one more former Prompt employee and set him to work at another site. When he quit two days later, complaining that he had been "overworked," he fell back into the pool of the unhired 13.)

The ALJ's answer to this question, adopted by the Board, is irrational: Laro "did not want to hire any more of Prompt's incumbent employees than it believed it was required to by GSA, in an effort to avoid a bargaining obligation with Local 32B." *Laro Maintenance Corp.*, 312 N.L.R.B. 155, 162 (1993). It is tempting to place a couple of exclamation points and a few question marks at the end of the ALJ's statement, a statement upon which the entire case turns. Why in the world would Laro think it could "avoid a bargaining obligation" by not hiring more Prompt employees? A "bargaining obligation" arises from a union's majority status. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 46–47, 107 S.Ct. 2225, 2237–38, 96 L.Ed.2d 22 (1987); *Burns Int'l Sec. Servs.*, 406 U.S. at 277–81, 92 S.Ct. at 1577–79; *Elastic Stop Nut Div. of Harvard Indus. v. NLRB*, 921 F.2d 1275, 1282 (D.C.Cir.1990). Local 32B was already over the top at Cadman Plaza. Ten of 18 is a majority. A bigger majority is still a majority. Are we supposed to believe that Laro could not do simple arithmetic?

The truth is that Laro's refusal to recognize Local 32B was not on the basis that the union lacked a majority at Cadman Plaza. Laro refused to bargain with Local 32B because Laro considered—incorrectly it turned out—the Cadman Plaza operation an accretion to the bargaining unit in Jamaica, Queens, where Laro cleaned another federal office building pursuant to a GSA contract. A different union, Local 355, represented Laro's Jamaica employees. The number of employees represented by Local 355 exceeded 18. Hence, no matter how many more former Prompt employees Laro hired at Cadman Plaza, the unit as Laro viewed it would still have had a majority of Local 355 members.

The fact that Laro hired a majority of its Cadman Plaza work force from the pool of Prompt employees gives the lie to the ALJ's—and the Board's—notion that Laro's alleged intent to avoid bargaining with Local 32B was a "motivating factor" behind the company's hiring decisions. Had Laro been thinking the thoughts the ALJ placed in its head it would have pared down GSA's list to 8 or less.

The rest of the ALJ's reasoning is makeweight, and just as nonsensical. Two examples should suffice. Consider first what the ALJ deduced from Laro's take-over of two other cleaning operations. When the company succeeded to the cleaning contract at the federal facility in Jamaica, Laro hired one-third of the incumbent employees, who were not then unionized. Upon taking over operations at Dowling College, Laro initially decided not to hire any incumbent employees, but wound up hiring all of them at the college's insistence; the incumbent employees were unionized. According to the ALJ, what happened at Jamaica and Dowling College shows

that Laro did not really "like[ ] to 'start fresh' with a new complement of employees" unless a union represented the incumbent workers. *Laro Maintenance Corp.*, 312 N.L.R.B. at 160–61. Nonsense again. There is no evidence whatever that Laro's initial desire at Dowling stemmed from anti-union sentiments. If Laro is so anti-union, how can one account for the fact that the Jamaica employees became organized without Laro's committing any unfair labor practices? All we know, all the Board and the ALJ knew, is that on one occasion Laro hired some incumbents and on another occasion it did not want to, but did. About the only thing to be gleaned from this bit of history is a common fact of business life having nothing to do with anti-union animus: sometimes there are good workers in the group of incumbents; sometimes there are not; and sometimes it is not worth trying to sort out the good from the bad.

Consider last the ALJ's "reasoning" that because Laro hired some unexperienced workers, anti-union bias must have moved it not to hire any of the 13 experienced Prompt employees. *Laro Maintenance Corp.*, 312 N.L.R.B. at 162–63. This too crosses the boggle threshold. In the ALJ's mind, experience must equal competence. Nonsense again. If you were in the cleaning business would you prefer an experienced Prompt employee, experienced that is in sleeping on the job, over a fresh face willing to work and eager to learn how to run a vacuum cleaner and empty a trash can?

My colleagues deeply bow in deference to the Board when they should be furrowing their brows at what the Board offered. More can be said, but this is enough to indicate why I respectfully dissent.