United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 8, 1997 Decided October 7, 1997 

 No. 96-1465

 TIC-The Industrial Company Southeast, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application for

 Enforcement of an Order of the

 National Labor Relations Board

 Lawrence W. Marquess argued the cause for petitioner, 
with whom Todd A. Fredrickson was on the briefs.

 David A. Fleischer, Senior Attorney, National Labor Rela-
tions Board, argued the cause for respondent, with whom 
Linda R. Sher, Associate General Counsel, and Aileen A. 
Armstrong, Deputy Associate General Counsel, were on the 


brief. Margaret G. Neigus, Supervisory Attorney, entered 
an appearance.

 Before: Edwards, Chief Judge, Wald and Garland, Circuit 
Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: TIC--The Industrial Company 
Southeast, Inc. ("Company") performs construction services 
in the southeastern United States. The Company's hiring 
policy for its Trapp, Kentucky project required job applicants 
to complete applications at the Winchester office of the 
Kentucky Department of Employment Services ("Job Ser-
vices") on special watermarked forms, and to omit informa-
tion not requested thereon. Members of International Broth-
erhood of Electrical Workers, Local Union No. 183 ("Local 
183") and United Association of Journeymen and Apprentices 
of the Plumbing and Pipe Fitting Industry of the United 
States and Canada, Local 452, AFL-CIO ("Local 452") (col-
lectively, "Unions") submitted two sets of job applications, 
completed at their union halls, on photocopied forms indicat-
ing union affiliation. The Company refused to consider these 
applications because they did not conform to its application 
guidelines.

 The General Counsel of the National Labor Relations 
Board ("Board") issued a complaint against the Company, 
charging a violation of section 8(a)(3) of the National Labor 
Relations Act ("Act"), 29 U.S.C. s 158(a)(3) (1994), attribut-
able to the Company's failure to consider the Union applica-
tions. An Administrative Law Judge ("ALJ") subsequently 
allowed the General Counsel to amend the original complaint 
to charge two violations of section 8(a)(1) of the Act, 29 U.S.C. 
s 158(a)(1) (1994), for two statements allegedly made by 
company supervisors that purportedly interfered with em-
ployees' union rights. After a hearing on the amended 
complaint, the ALJ found that the Company had discrimi-
nated against the Union applicants. The ALJ also found that 
the Company had violated section 8(a)(1) by virtue of the two 
supervisor statements. The Board adopted the ALJ's find-


ings. TIC-The Industrial Company Southeast, Inc., 322 
N.L.R.B. No. 103 (Nov. 29, 1996), reprinted in Joint Appen-
dix ("J.A.") 37. We grant the petition for review opposing 
the Board's finding of an 8(a)(3) violation. On the record at 
hand, there is no substantial evidence supporting the finding 
of discriminatory refusal to consider the Union applications. 
We further find that the ALJ acted without justification in 
allowing the General Counsel to amend the complaint with 
respect to one of the supervisor statements, because the new 
allegation did not share sufficient factual affiliation with the 
original charge. With respect to the other supervisor state-
ment, we find that while the ALJ correctly permitted amend-
ment, there was no substantial evidence supporting the find-
ing of an 8(a)(1) violation. Accordingly, we grant the petition 
for review challenging the findings of 8(a)(1) violations.

 I. Background

 In late February 1994, the Company began construction of 
turbine generating stations at Trapp, Kentucky. It recruited 
employees through Job Services, and provided written appli-
cation guidelines: applicants were required to write in ink on 
special watermarked application forms, complete the forms at 
Job Services, and not attach rsums or include any extrane-
ous information not requested, such as "Vet, Boy Scout or 
Union Organizer." Applicants could not apply for "any posi-
tion" but only for unfilled positions. J.A. 40.

 When positions became available, the Company would in-
form Job Services, which would post a notice on its bulletin 
board and provide applicants with watermarked application 
forms. A Company manager would come to Job Services and 
screen the applications, collecting those that conformed with 
the guidelines and leaving behind those that did not. J.A. 40-
41. Job Services had a policy of contacting persons whose 
applications did not conform; however, because of personnel 
limitations, this policy was not always followed. Transcript 
("Tr.") at 580-81. There is absolutely nothing in the record 
to suggest that Job Services distinguished between Union 


adherents and other persons in processing job applications 
for the Company.

 On "two or three" occasions, according to unopposed testi-
mony credited by the ALJ, a Company manager asked Job 
Services to contact particular applicants whose applications 
did not conform to ask these persons to submit proper 
applications. J.A. 41. On one such occasion, a Job Services 
employee added the word "Vet" to some applications that 
were otherwise in proper form. After the Company rejected 
the applications for extraneous information, Job Services' 
Veterans Representative contacted the applicants at the ap-
parent request of the Company, asking them to reapply. J.A. 
41, Tr. 584.

 In August 1994, Job Services explained the Company's 
guidelines to the business manager of Local 183. Tr. 572-78. 
Following this conversation, on August 17, the business agent 
of Local 452 distributed xeroxed applications at his union hall. 
Twelve union members filled out the xeroxed application 
forms and returned them to the business agent, who wrote 
"Union organizer" on each of them and mailed them to Job 
Services. J.A. 41. Job Services mailed the applications to 
the Company. On August 22, Local 183 mailed ten members' 
applications on xeroxed forms to Job Services. Nine of the 
ten listed union locals as the only previous employer. J.A. 41. 
(One of these applicants was not named in any subsequent 
proceedings.)

 Noting that the Local 183 applications lacked watermarks 
and had been mailed, Company Safety Manager Knight re-
jected the Local 183 applications, and forwarded them to 
Terry Cooksey, the Company's Director of Personnel and 
Safety. Cooksey returned the applications to Job Services. 
Noting the lack of watermarks and the extraneous informa-
tion "Union organizer," Knight also rejected the Local 452 
applications, first sending them to Job Services, then retriev-
ing them and passing them to Cooksey, who retained them in 
anticipation of litigation. J.A. 41-42.

 On August 29, 1994, the Company hired electrician John 
Barck. He testified that, on his first day of work, he asked 


Area Superintendent James Smith, who had hired him for the 
project, whether the Company needed more employees. 
Smith indicated that the Company was hiring, but that "the 
only way they were taking applications is if you were ... a 
prior employee or if you were referred by somebody, in order 
to avoid bringing in union personnel." J.A. 41. Shortly 
thereafter, Foreman Rick Queen, whose responsibilities in-
cluded reviewing job applications and interviewing, asked 
Barck whether any employees on the Trapp project were 
"union." Queen indicated that the Company suspected two 
employees of union activity. Barck replied that he did not 
know of any union membership or activity. J.A. 41. The 
ALJ credited Barck's account of the two conversations over 
the supervisors' denials. J.A. 41 & n.7.

 The ALJ found that, because the Company had occasionally 
asked Job Services to contact non-conforming applicants to 
request new applications, and had not done so with respect to 
applications submitted by persons claiming to be union adher-
ents, the evidence indicated a violation of section 8(a)(3). The 
ALJ also found that the supervisors' comments, reported by 
Barck, had violated section 8(a)(1). The Board affirmed the 
ALJ's findings, and ordered appropriate remedies.

 II. Analysis 

1. Evidence of Anti-Union Discrimination

 Board findings must be respected on review if supported by 
substantial evidence on the record considered as a whole. 29 
U.S.C. s 160(e) (1994); Laro Maintenance Corp. v. NLRB, 
56 F.3d 224, 228-29 (D.C. Cir. 1995). In this case, it is clear 
that the record before the ALJ did not contain substantial 
evidence to support the conclusion that the Company's refusal 
to consider the Union applications constituted discrimination 
in violation of section 8(a)(3). The Union applications indis-
putably failed to conform to the Company's facially neutral 
hiring guidelines. The evidence of disparate treatment of 
Union applications consisted of testimony that on "two or 
three" occasions the Company asked Job Services to contact 
persons whose applications did not conform, but had not 


made a similar request with respect to persons whose applica-
tions identified them as Union adherents.

 Under Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 
662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982), 
approved by the Supreme Court in NLRB v. Transportation Man-
agement Corp., 462 U.S. 393, 402-03 (1983), the General 
Counsel is required to "make a prima facie showing sufficient 
to support the inference that protected [i.e. union-related] 
conduct was a 'motivating factor' in the employer's decision" 
to take adverse action. Wright Line, 251 N.L.R.B. at 1089. 
If the General Counsel succeeds in that showing, the burden 
then shifts to the Company to rebut the inference by showing 
by a preponderance of the evidence that it would have 
rejected the applicants even absent union affiliation. Id.

 The ALJ concluded that the facts here made out "a prima 
facie showing that the union affiliation of the 21 rejected job 
applicants was a motivating factor in [the Company's] deci-
sion to reject them." J.A. 42. The ALJ relied on three 
pieces of evidence in determining motivation: the Company's 
knowledge of the applicants' union status; its disparate treat-
ment of other rejected applicants; and its anti-union animus, 
as inferred from the testimony of employee John Barck. Id. 
Even taken as true, these pieces of evidence do not suffice for 
a prima facie showing.

 Prohibited motive will not be inferred where job applicants 
fail to follow regularly applied, facially neutral application 
procedures. See Zurn Nepco, 316 N.L.R.B. 811, 818 (1995) 
(no discriminatory refusal to hire where company followed its 
facially neutral procedure "in almost all cases"); Fluor Dan-
iel, Inc., 311 N.L.R.B. 498, 499 (1993) (insufficient evidence of 
anti-union motive where applicant filed incomplete applica-
tion), enforced and remanded, 102 F.3d 818 (6th Cir. 1996). 
Here, the ALJ acknowledged that the Company regularly 
refused to consider all non-conforming applications and it was 
undisputed that the Union applications did not conform to the 
guidelines. J.A. 40-41. The mere fact that the Company 
knew the applications were from Union applicants does not 
show animus. Cf. Fluor Daniel, Inc., 311 N.L.R.B. at 499 


(company's knowledge of applicant's union affiliation did not 
suffice to show animus).

 There was also insufficient evidence of disparate treatment 
of other applicants. It was Job Services' policy to contact all 
persons whose applications did not conform with the guide-
lines, without regard to Union affiliation. That the Company 
on two or three occasions asked Job Services to follow its own 
policy cannot support a finding of discrimination where the 
Company did not make such a request. The record does not 
provide any evidence of a baseline practice from which the 
Company discriminatorily deviated in its treatment of the 
Union applications.

 Finally, the supervisor's statement to the effect that the 
Company sought to avoid hiring union personnel might have 
given the Board reason to search for more evidence of 
discrimination, but did not on its own suffice to prove anti-
union animus. A showing of animus requires greater proof 
than a single comment by a supervisor to the effect that the 
company preferred to hire non-union personnel. See, e.g., 
Tualatin Elec., Inc., 319 N.L.R.B. 1237, 1239 (1995) (animus 
existed where owner evinced "deep hostility" towards union, 
which he called "organized crime"); Ultrasystems W. Con-
structors, Inc., 310 N.L.R.B. 545, 554 (1993) (animus existed 
where company directives called union "infection" and where 
"numerous incidents of coercion" occurred), enforcement de-
nied and remanded, 18 F.3d 251 (4th Cir. 1994), on remand, 
316 N.L.R.B. 1243 (1995). Furthermore, there was no evi-
dence that the supervisor had any role in refusing to consider 
the Union applicants here.

 Because the General Counsel did not make a prima facie 
showing of anti-union animus, the burden did not shift to the 
company to show by a preponderance of the evidence that it 
would have refused to consider the applications even had they 
not belonged to Union applicants. See Wright Line, 251 
N.L.R.B. 1089. However, even if the Wright Line burden 
had shifted, the Company met its burden of showing that it 
would have refused to consider the applications regardless of 
the applicants' union affiliation. Where a company has con-


sistently followed neutral guidelines, and does so in the case 
in question, it has met its burden of showing it would have 
refused to consider applications that deviated from the nor-
mal procedure. See VOS Elec., Inc., 309 N.L.R.B. 745, 753 
(1992) (company burden satisfied where company "demon-
strated that applications, from whatever source, were all 
processed in the same manner"). Here, undisputed testimo-
ny indicated that the Company normally rejected non-
conforming applications. J.A. 40-41. No evidence suggested 
that the Company actively considered non-conforming appli-
cations. Thus, the Company would have refused to consider 
the Union applications even had they not been made by 
Union members.

2. Amendments to the Original Charge

 When the Board considers allegations not contained in an 
original charge, "it must limit itself to matters sharing a 
significant factual affiliation with the activity alleged in the 
charge." G.W. Galloway Co. v. NLRB, 856 F.2d 275, 280 
(D.C. Cir. 1988). The Board looks to whether the complaint 
(1) involves the same legal theory as the charge allegation, (2) 
arises from the same factual circumstances or sequence of 
events as the charge allegation, and (3) raises similar defens-
es as the charge allegation. Nickles Bakery, Inc., 
296 N.L.R.B. 927, 928 (1989); see also Drug Plastics & Glass 
Co., Inc. v. NLRB, 44 F.3d 1017, 1021 (D.C. Cir. 1995) 
(endorsing and applying Nickles Bakery test). It is insuffi-
cient that the allegations merely emerge from the same anti-
union campaign. Id. at 1021.

 One of the amended allegations of section 8(a)(1) violations 
did not share a significant factual affiliation with the discrimi-
natory refusal to consider the Union applications alleged in 
the original complaint. This amended allegation charged that 
a Company supervisor had asked for information about union 
affiliation of employees at the work site. This did not involve 
the same legal theory as the charge of refusal to consider 
applications, nor indeed did it involve hiring at all. It arose 
from a different incident than that of the Union applications, 


and raised the defense of denial or disowning of the incident, 
rather than any defense related to the Union applications. In 
short the charge failed all three required grounds of related-
ness.

 The other amended charge alleged that a supervisor had 
communicated to an employee a Company preference for non-
union hiring. This amended allegation was properly allowed, 
because it shared a significant factual affiliation with the 
original charge. However, the single, isolated comment that 
forms the entire basis for the alleged 8(a)(1) violation did not 
constitute substantial evidence of restraint, coercion, or inter-
ference with employees exercising protected rights under 
section 8(a)(1). Nothing in the record suggests that the 
supervisor had any authority to establish policies with respect 
to hiring or treatment of employees. There is no evidence 
that the supervisor's statement tended to coerce any employ-
ees' exercise of protected activity. There is also no evidence 
that either John Barck, who heard the statement, or other 
employees could have been coerced in any way by the mere 
assertion that the Company preferred non-union hiring. Cf. 
E&L Transport Co. v. NLRB, 85 F.3d 1258, 1273-74 (7th Cir. 
1996) (no 8(a)(1) violation where employer statement could 
not have coerced employees who heard it). Indeed, it ap-
pears that the General Counsel introduced the amended 
8(a)(1) allegations primarily to buttress the case for 8(a)(3) 
violations against the Company. Regardless of the General 
Counsel's purpose, the statement alone was not substantial 
evidence sufficient to support a violation of 8(a)(1).

 III. Conclusion

 In light of the foregoing, the petition for review is granted 
and the cross-application for enforcement is denied.

So ordered.