**SCHAEFF INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 96–1190.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1997.

Decided May 27, 1997.

within the company. Accordingly, we deny Schaeff's petition for review.

## I. BACKGROUND

Schaeff manufactures forklifts in Sioux City, Iowa.[1] Until October 1994, Massey, McCleary and Pedersen worked at Schaeff.[2] Massey was a material handler in the welding section and McCleary and Pedersen worked in the final assembly section. In early August, after he was transferred to the night shift and his pay was decreased, Massey contacted labor activist Richard Sturgeon about unionizing Schaeff employees. Massey subsequently spoke with a number of fellow Schaeff employees about Sturgeon and his organization, Workers Have Rights Too. Pedersen was among those employees and Pedersen also spoke to other employees about meeting with Sturgeon. On September 14, Isaac Avitan, Schaeff's general manager, sent a letter to all employees alerting them that a small group of pro-union employees had been advocating "alter[ing] employee relations with their employer." JA 521.

On October 8, Massey, McCleary and Pedersen met with Sturgeon, who gave them literature on labor matters including workers' compensation. On October 11 or 12, Pedersen met with Sherrie Avitan (Mrs. Avitan),[3] Schaeff's human resources manager, and gave her a copy of one of the booklets he had received from Sturgeon. Massey was fired on October 12 and McCleary and Pedersen were fired the following day. Schaeff also fired three other employees on October 12 and 13.

During this period, Schaeff was struggling to overcome financial difficulties. It had suffered substantial losses and Avitan was seeking ways to improve its efficiency. According to Schaeff, its decisions to reduce from three to one the number of material handlers in the welding section and to eliminate the final assembly section and transfer its duties to other parts of the plant were compelled by the need to improve productivity and reduce

Gerald M. Richardson, St. Louis, MO, argued the cause, for petitioner.

Angela M. Washington, Attorney, National Labor Relations Board, argued the cause, for respondent. Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Attorney, National Labor Relations Board, were on brief. David A. Seid, Attorney, Washington, DC, National Labor Relations Board, entered an appearance.

Before: SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge.

Schaeff Inc. (Schaeff) petitions for review of an order of the National Labor Relations Board (Board) concluding that it fired Tom Massey (Massey), Darren McCleary (McCleary) and Richard Pedersen (Pedersen) because of their organizing activities. Specifically, Schaeff argues that it decided to terminate them before learning of their protected activity and therefore antiunion animus played no role in its decision. Schaeff argues in the alternative that it established its affirmative defense that its financial condition made Massey's, McCleary's and Pedersen's firings inevitable. Although some evidence supports Schaeff's position, there is sufficient evidentiary support for the Board's findings. As to Schaeff's affirmative defense, Schaeff did not establish that Massey's position was eliminated for financial reasons or that Massey, McCleary and Pedersen were unsuitable for transfer to other positions

---

1. Schaeff Inc. is a subsidiary of Schaeff Machine Fabrik GMBH, a German company. Here, "Schaeff" refers only to the U.S. subsidiary.

2. Except as otherwise noted, all relevant events occurred in 1994.

3. Avitan and Mrs. Avitan are married.

costs and were put into motion well before Massey's, McCleary's and Pedersen's protected activities took place. The timing and significance of Schaeff's streamlining decisions were contested before the administrative law judge (ALJ) and the Board.

On January, 19, 1995, the Board's General Counsel filed a complaint on behalf of Massey, McCleary and Pedersen alleging that they had been terminated in violation of 29 U.S.C. § 158(a)(1) and (3).[4] On August 15, 1995, the ALJ issued a decision finding that Schaeff had terminated Massey, McCleary and Pedersen in violation of section 158(a)(1) and (3) and a recommended order directing Schaeff, *inter alia,* to rehire them in their former positions. JA 37–52. Schaeff filed exceptions to the ALJ's decision and order and, on May 16, 1996, the Board issued a decision adopting the ALJ's rulings, findings and conclusions and an order substantially adopting the ALJ's order, except that it ordered that Schaeff could place Massey, McCleary and Pedersen in positions equivalent to their former positions. JA 36–37.

## II. DISCUSSION

■ Schaeff primarily challenges the Board's factual findings regarding the circumstances of Massey's, McCleary's and Pedersen's firings. We reject the Board's factual findings only if they are not supported by substantial evidence in the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456,

463–65, 95 L.Ed. 456 (1951); *Pennsylvania State Educ. Ass'n–NEA v. NLRB,* 79 F.3d 139, 148 (D.C.Cir.1996). In conducting our analysis, we consider not only the evidence supporting the Board's decision but also "whatever in the record fairly detracts from its weight." *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465 *see also CitiSteel USA, Inc. v. NLRB,* 53 F.3d 350, 354 (D.C.Cir.1995). We accept the ALJ's credibility determinations that are adopted by the Board "unless they are patently unsupportable." *NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1297 (D.C.Cir.1988).

### A. Knowledge of Protected Activity and Anti–Union Motivation

■ Schaeff argues that substantial evidence does not support the Board's determination that Schaeff knew about and was motivated by the three employees' protected organizing activities when it fired them. It is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights, *inter alia,* to organize or "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(1), (3). To establish a violation, the General Counsel had to prove that the three employees' organizing activities were a motivating factor in Schaeff's decision to fire them.[5] *Southwest*

---

**4.** Section 158(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their rights to organize and section 158(a)(3) makes it an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

**5.** Schaeff and the Board dispute the impact of the United States Supreme Court's decision in *Office of Workers' Compensation v. Greenwich Collieries,* 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), on the test the Board enunciated in *Wright Line,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The *Wright Line* test requires the General Counsel to demonstrate that anti-union animus was a motivating factor in an employer's decision to take adverse action against an employee. *Wright Line,* 251 N.L.R.B.

at 1089. Once the General Counsel does so, the employer may establish as an affirmative defense that the adverse action would have occurred for legitimate reasons even in the absence of the employee's protected activities. *Id.* Schaeff claims that, unlike the Supreme Court's earlier interpretation of *Wright Line, Greenwich Collieries* places the burden of persuasion on the General Counsel at all times. Pet'r Br. 22–23. The Board, meanwhile, claims that *Greenwich Collieries* reaffirms the *Wright Line* test. Resp't Br. 16–17 n.2. Both are correct. *Greenwich Collieries* does hold that the ultimate burden of persuasion remains with the General Counsel. *Greenwich Collieries,* 512 U.S. at 276–78, 114 S.Ct. at 2257–58. It thus overrules the portion of *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401–04 & n. 7, 103 S.Ct. 2469, 2474–75 & n. 7, 76 L.Ed.2d 667 (1983), holding that the General Counsel has only the burden of going forward with evidence of discrimination and

*Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1339–40 (D.C.Cir.1995).

Schaeff asserts that no evidence supports the finding that Schaeff management knew about Massey's, McCleary's and Pedersen's organizing activities. But Avitan's September 14 letter about the "small but vocal group" of pro-union advocates strongly suggests that he and other Schaeff managers knew about whatever organizing activities were then underway. Massey easily could be described as a pro-union advocate by September 14: he had talked with Sturgeon as early as the beginning of August (shortly after being transferred to the night shift), JA 126, 171, and had talked with other employees about Workers Have Rights Too in the several weeks before October 12, JA 172–73. Some evidence suggests that Pedersen also had at least discussed organizing before September 14: according to Massey, Massey first told Pedersen about Sturgeon in August.[6] JA 183–84. Pedersen thus might also have come to Schaeff's attention as a member of the "small but vocal group." As to McCleary, however, there is no evidence that he knew anything about Sturgeon or Workers Have Rights Too before the September 14 letter. By McCleary's undisputed account, Massey first told him about Workers Have Rights Too during the period October 3–6. JA 87–88, 113–14. In sum, the September 14 letter indicates that Schaeff management knew some organizing effort was afoot and supports a finding that management was aware of Massey's and perhaps Pedersen's pro-union activities.

The Board next contends that management learned of Sturgeon's October 8 meeting with Massey, McCleary and Pedersen no later than very shortly after that meeting and in any event before they were fired on October 12 and 13.[7] Massey testified that he spoke with several other employees about the meeting beforehand and with two employees afterward. JA 183–84. Pedersen testified that he and Massey informed twenty to thirty other employees about the meeting before it occurred and that he spoke with "[m]ost of" Schaeff's employees thereafter. JA 134, 150–51. Thus, there is evidence that many, if not most, of Schaeff's employees knew of the October 8 meeting either beforehand or soon thereafter. Particularly given Avitan's acknowledged practice of mingling with the employees in the plant, JA 410–11, there is adequate support for an inference that management also knew about the October 8 meeting before or immediately after it occurred.[8] In addition, Pedersen met with Mrs. Avitan on October 11 or 12, gave her a copy of one of the booklets Sturgeon had handed out at the October 8 meeting and told her Sturgeon's name and telephone number were written in the booklet. JA 134–35, 212, 247–48. Sufficient evidence supports the finding that Schaeff management knew about the October 8 meeting involving Sturgeon, Massey, McCleary and Pedersen before the

---

does not retain the burden of persuasion throughout the proceeding. But the Court added that, once the General Counsel establishes that anti-union animus was a motivating factor, the employer bears the burden of establishing any affirmative defense such as the inevitability of termination. *Greenwich Collieries,* 512 U.S. at 278, 114 S.Ct. at 2257. The practical effect of *Greenwich Collieries* thus may be no more than the abandonment of the term *"prima facie case"* to describe the General Counsel's burden. *See Southwest Merchandising Corp.,* 53 F.3d at 1339–40 & n. 8 ("[I]n the wake of *Greenwich Collieries,* it will no longer be appropriate to term the General Counsel's burden that of mounting a *prima facie* case.").

6. According to Pedersen, however, Massey first talked to him about meeting with Sturgeon after the September 14 letter. JA 161.

7. October 8, 1994, was a Saturday.

8. Schaeff argues that the Board is not entitled to take advantage of the "small plant doctrine," under which management may be charged with constructive knowledge of organizing activities in workplaces with fewer than 100 employees. *See, e.g., Howard Press, Inc.,* 265 N.L.R.B. 1389, 1982 WL 24127 (1982), *pet. denied,* 729 F.2d 172 (2d Cir.1989). But the Board did not rely on the small plant doctrine. The ALJ identified evidence of management's knowledge of the October 8 meeting; for example, he pointed to the wide-spread dissemination of information about the meeting among employees, the testimony of mid-level managers Mike Hofer and Brian Rawlings that they had heard about the meeting beforehand and Avitan's frequent visits to the production floor. JA 50.

three were fired on October 12 and 13.[9]

Knowledge by itself is not sufficient, however; an unfair labor practice occurs only when the employer's knowledge of its employees' pro-union activities is a motivating factor in its decision to fire them. *See Southwest Merchandising,* 53 F.3d at 1339. Schaeff contests the motivation element as well. The ALJ, however, identified a number of factors suggesting that Massey's, McCleary's and Pedersen's firings were motivated by Schaeff's anti-union animus. Specifically, the ALJ pointed to the facts that all three employees who met with Sturgeon were fired; that those three were half of the total number fired on October 12 and 13; that Massey, McCleary and Pedersen were fired within days of meeting with Sturgeon and almost immediately after Pedersen met with Mrs. Avitan and gave her a copy of one of Sturgeon's booklets; and that the firings occurred abruptly in the middle of a workweek. JA 51.

But Schaeff asserts that its decision to fire Massey, McCleary and Pedersen preceded their meeting with Sturgeon "by several days at least." Pet'r Br. 26. The ALJ, however, did not credit the testimony of those members of management who claimed that they had no knowledge of Massey's, McCleary's and Pedersen's organizing activities until after they were fired and that Schaeff planned to fire Massey, McCleary and Pedersen before they met with Sturgeon. JA 36 n.1. In particular, the ALJ observed that Thomas Winner, Schaeff's operations manager, contradicted Avitan's claim that Schaeff decided to eliminate Massey's, McCleary's and Pedersen's positions in response to a poor financial report Schaeff received in mid-August. JA 49. The ALJ also noted that Mrs. Avitan's testimony that over a week passed between the decision to fire Massey, McCleary and Pedersen and their actual firing was improbable. JA 49. Schaeff offers no persuasive reason to upset the ALJ's credibility determinations. *See Exxel/Atmos, Inc. v. NLRB,* 28 F.3d 1243, 1246 (D.C.Cir.1994) (court accepts ALJ's credibility determina-

tions unless "patently unsupportable"); *NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1297 (D.C.Cir.1988) (same). Furthermore, even if Schaeff planned to fire Massey, McCleary and Pedersen before October 8, Massey and Pedersen both stated that they spoke with other employees about the meeting before it occurred. In addition, Massey (and perhaps Pedersen as well) began talking to other employees about organizing as early as August and September. Assuming *arguendo* that Schaeff made its firing decision before the October 8 meeting, it nevertheless is reasonable to infer that Schaeff also knew about the organizing effort by the time it made the decision.

Notwithstanding the contrary evidence advanced by Schaeff, substantial evidence supports the Board's determinations that Schaeff knew about Massey's, McCleary's and Pedersen's organizing activities and that anti-union animus motivated, at least in part, their firings.

## B. Inevitability of Termination

 Schaeff argues that, even if its management knew about the three employees' protected activities and that knowledge played a role in their firings, they would have been fired anyway for economic reasons. A company's financial situation or other nondiscriminatory motive may justify otherwise improper firings, *see, e.g., Robinson Furniture, Inc.,* 286 N.L.R.B. 1076, 1079–80, 1987 WL 90031 (1987), but the company bears the burden of proving that the nondiscriminatory motive was in fact the cause of the firings. *Southwest Merchandising Corp.,* 53 F.3d at 1340.

Schaeff contends that Massey was caught up in its initiative to increase efficiency in the welding department by eliminating material handler jobs. In support of its position, it observes that one of the two other material handler jobs also was eliminated. There are, however, at least two problems with Schaeff's position. First, the one material handler who was retained had just been hired on

---

**9.** Although the evidence ties Massey and Pedersen to the October 8 meeting more conclusively than it does McCleary, it nevertheless is reason-able to infer that, if management knew generally about the October 8 meeting, it would also know McCleary had attended.

September 12.[10] JA 330. The decision to fill the position at a time of purported belt-tightening casts doubt on Schaeff's claim that Massey's firing was merely part of a general decision to reduce the number of material handlers in the welding section. Second, the material handler (Dyke) whose position was eliminated before Massey's was moved to another job. If Massey had been the least effective material handler, presumably his job would have been eliminated first. That his position was eliminated second suggests Massey was at least as competent as Dyke. Thus, the fact that Dyke received another job within the company while Massey did not further supports the finding that Massey's firing was not simply a matter of efficiency. Accordingly, the Board was justified in rejecting Schaeff's affirmative defense as to Massey.

Schaeff argues that its financial difficulties also led it to eliminate its final assembly operation and that Pedersen and McCleary were fired as a result of that decision. The Board does not contest that elimination of the final assembly operation was financially motivated. Instead, it argues that Pedersen and McCleary were qualified for other positions within the company and that the fact that they were not transferred to new jobs along with others whose jobs were eliminated undermines Schaeff's claim that their firing was efficiency-based. Schaeff identifies a number of reasons for its position that Pedersen and McCleary were not qualified for other positions. Specifically, it points to Pedersen's physical condition and resulting weight-lifting restrictions and his lack of hydraulic, tooling and mechanical experience and to McCleary's apparent slowness and general lack of skills. But contrary to Schaeff's assertions, the evidence of Pedersen's and McCleary's unsuitability for other positions is not uncontested. The Board observes that Schaeff thought enough of Pedersen's abilities to send him to classes in supervision, JA 126; that Pedersen did have hydraulic and drilling experience, JA 125, 130; and that McCleary had quality assurance, assembly and drilling experience, JA 82.[11] While Schaeff presented evidence upon which a different fact-finder might have determined that Pedersen and McCleary were destined to lose their jobs regardless of their organizing activities, sufficient evidence supports the Board's contrary conclusion.[12]

Because substantial evidence supports the Board's determination that Massey's, McCleary's and Pedersen's organizing activities were known to Schaeff and were a motivating factor in their firings and because Schaeff did not carry its burden of persuasion on the economic inevitability defense, we deny Schaeff's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

---

**10.** In fact, he may not have been officially hired until September 15. JA 505.

**11.** Schaeff also argues that it had no legal duty to find other jobs for Massey, McCleary and Pedersen. Pet'r Br. 36–37. Assuming *arguendo* Schaeff is correct, Schaeff's decision not to move Massey, McCleary and Pedersen to other positions within the company nevertheless is relevant to the extent that it demonstrates they were treated differently from other similarly situated employees. If Massey, McCleary and Pedersen were qualified for other positions, that they were fired when other employees were merely trans-

ferred supports an inference that Schaeff's financial situation was not the only reason for their firings.

**12.** As the General Counsel's case was weakest with regard to Schaeff's knowledge of McCleary's pro-union activities, so Schaeff's affirmative defense is strongest as to McCleary. McCleary appears to have had the fewest qualifications of the three and had received at least one written warning about sub-standard performance. JA 584–86. Nevertheless, the Board has identified sufficient evidence that McCleary was qualified for other positions within the company.