129 F.3d 1276
 156 L.R.R.M. (BNA) 2963, 327 U.S.App.D.C. 164,
134 Lab.Cas. P 10,085
 LCF, INC. d/b/a La Conexion Familiar, and Sprint
Corporation, Petitioners/Cross-Respondents
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner
Communications Workers of America, Intervenor
 No. 96-1500.
United States Court of Appeals,
 District of Columbia Circuit.
 Argued Oct. 7, 1997.
Decided Nov. 25, 1997.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Thomas J. Piskorski argued the cause for petitioners/cross-respondents, with whom Staci S. Beck, Chicago, IL, and Stanley E. Craven, Kansas City, MO, were on the briefs.
 David A. Fleischer, Senior Attorney, National Labor Relations Board, Pickerington, OH, argued the cause for respondent/cross-petitioner, with whom Linda R. Sher, Associate General Counsel, South Euclid, OH, and Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, were on the brief. Margaret G. Neigus, Supervisory Attorney, entered an appearance.
 James B. Coppess, Washington, DC, argued the cause for intervenor Communications Workers of America, with whom Laurence Gold was on the brief.
 Before: WALD, GINSBURG and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge.
 
 
 1
 This case arises out of Sprint's decision to terminate its "La Conexion Familiar" long-distance program and dismiss all program employees. Sprint argues that this decision was based on the program's substantial financial losses and a continuing decline in its customer base. The National Labor Relations Board ("NLRB"), however, found that Sprint acted because program employees were about to unionize. It ordered Sprint to reinstate each terminated employee as a substantially equivalent position becomes available and to pay each employee the difference between what the employee would have earned if never terminated and what the employee actually earned during the period before Sprint offered the employee reinstatement. This case is before the court on Sprint's petition to review the NLRB's order and on the NLRB's cross-application for enforcement of its order.
 
 
 2
 The NLRB's conclusion that union activity motivated Sprint's closure decision lacks substantial evidence in the record. Accordingly, we set the NLRB's order aside.
 
 I. BACKGROUND
 
 3
 Sprint created a wholly-owned subsidiary, LCF, Inc. ("LCF"), solely to acquire the La Conexion Familiar company ("La Conexion") in 1992. La Conexion specialized in selling long-distance services to the Latino residential market, particularly to people who primarily spoke Spanish. Rather than competing on the basis of price, its strategy was to develop customer loyalty based on common culture and language.
 
 
 4
 Shortly after acquiring La Conexion, Sprint discovered that the majority of its telemarketers were undocumented aliens and sued La Conexion's sellers to rescind the purchase agreement. Under a settlement reached in January 1994, however, Sprint retained La Conexion for a reduced purchase price.
 
 
 5
 During the course of this rescission suit, Sprint did not invest significant additional time or money in LCF. After the settlement, Sprint set out in early February 1994 to determine LCF's true financial condition and soon discovered that LCF was in serious financial difficulty. Sprint instituted some changes, including a new discount program, but LCF's financial condition remained poor. In particular, LCF was losing more customers than it was acquiring. By March 1994, Sprint's economic analysis indicated that LCF, which Sprint had originally expected would generate a profit of nearly $8 million in 1994, was now projected to lose almost $4 million that year. Sprint Consumer Services Group ("CSG") Vice President Wallace Meyer, the officer ultimately in charge of LCF but based in Kansas City, began spending at least one day a week at LCF in San Francisco.
 
 
 6
 Union organizing activity at LCF also commenced in early February 1994. In response to employee complaints about working conditions, the Communications Workers of America ("CWA") began an organizational campaign that quickly gained momentum. By February 14, the on-site LCF managers had learned that telemarketing employees were attending union meetings and engaging in other union activities. The Administrative Law Judge ("ALJ") and the NLRB both found, on the basis of undisputed testimony, that some of these on-site managers illegally interrogated employees about the union and threatened them with plant closure if the employees unionized. The LCF managers also kept Sprint officials informed about the union activity at LCF.
 
 
 7
 In April, Dave Sapenoff, Sprint's group manager for corporate labor relations, visited the LCF facility. Mr. Sapenoff met with the LCF supervisors, collected the names of employees who supported the union, and instructed the supervisors to try to convince these employees to change their minds. However, he also told both the LCF employees and their supervisors that LCF would not close if the employees unionized. Upon his return to Sprint headquarters, Mr. Sapenoff reported the union activity to Dave Schmieg, the Sprint CSG President, and to Carl Doerr, the vice president for labor relations and fair employment practices. After receiving this information, Mr. Doerr told Mr. Schmieg that there was a significant possibility that CWA would file a representation petition. Mr. Schmieg responded by reiterating a remark that he had previously made to Mr. Doerr. He told Mr. Doerr that it was his intent to close LCF because he did not believe that Sprint " 'had any business being in that business.' " Mr. Doerr then stated that, given the likelihood of CWA filing a petition, Mr. Schmieg should " 'create a paper trail' " if he intended to close LCF. LCF, Inc., d/b/a La Conexion Familiar, Sprint Corporation and Communications Workers of America, District Nine and Local 9410, AFL-CIO, 322 N.L.R.B. No. 137 at 4, 1996 WL 742383 (Dec. 27, 1996) (hereinafter "NLRB Decision").
 
 
 8
 Meanwhile, Mr. Meyer's concerns about LCF's finances continued throughout April. These concerns led him to convene a meeting of LCF's board of directors on May 6, just three months after LCF had been placed under his jurisdiction. At this meeting, Mr. Meyer presented his projection that LCF would lose almost $4 million in 1994, instead of earning the nearly $8 million profit that Sprint had anticipated in early 1994. He further outlined two managerial options in light of LCF's financial difficulties. The first, which Mr. Meyer supported, was to cease LCF operations immediately. The other option was to continue operations through December 1994. After some discussion, the LCF board took neither option; it voted against closing LCF immediately and decided to reconvene in sixty days in order to review LCF's financial performance and discuss six options for LCF's future. The meeting minutes summarize this decision as follows:
 
 
 9
 "The Board was universal in its concern regarding the company's revenue shortfall from the 1994 budget and accompanying operating loss. As a result, the Board will again review the company's financial performance against the revenue forecast in July at the next meeting. Also at the next meeting, six strategic options governing disposition and longevity of the LCF, Inc. business will be presented. These options are: (a) immediate discontinuance of current business, (b) sell LCF business and assets, (c) continue business as planned but review progress against revised financial objections every 60 days, (d) employ an agent as business manager ...., (e) relocate business to establish greater alignment/proximity to Sprint resources, and (f) continue business through at least December 1994 utilizing 1994 performance and 1995/96 financial projections as evaluation criteria."
 
 
 10
 NLRB Decision at 4.
 
 
 11
 The LCF board also decided at the May 6 meeting to hire Maury Rosas as president of LCF. Mr. Rosas signed a one-year employment contract on May 13. He was not told that LCF might close in light of its financial situation and, upon assuming his position on June 1, Mr. Rosas operated LCF on the assumption that the enterprise would remain in business. LCF continued hiring and training employees and proceeded with plans for extensive office renovations. Mr. Meyer testified that he planned to use Mr. Rosas elsewhere within Sprint if LCF closed.
 
 
 12
 On June 3, CWA filed a petition to represent the LCF employees. To show their support for this filing, over 100 of the approximately 177 bargaining-unit employees wore, or displayed, union T-shirts on June 3. LCF's management was aware of the T-shirt demonstration, and supervisors were instructed to report the number of employees wearing the shirts. Mr. Rosas and other LCF officials conferred with Sprint headquarters about the matter. On June 22, LCF and CWA entered into a stipulated election agreement and scheduled a representation election for July 22.
 
 
 13
 After learning that CWA had filed this petition, Labor Relations Vice President Doerr received materials relating to the May 6 board meeting.[1] Mr. Doerr became concerned that these materials did not sufficiently reflect an intent to retain the closing of LCF as an option. He therefore decided to create a paper trail showing that Sprint's intent to close LCF existed prior to the filing of the petition. Mr. Doerr accomplished this by soliciting a backdated letter from an outplacement service. This letter was falsely dated April 7 and discussed a prior request by Mr. Doerr for outplacement services for the LCF employees. Mr. Doerr admittedly sought this backdated letter to counter any contention that Sprint decided to close LCF in response to the union activity.
 
 
 14
 As the LCF board had agreed on May 6, the next meeting of the LCF board was scheduled for July 6 in Kansas City. Before this meeting took place, Mr. Meyer, anticipating that the board would vote to close LCF, instructed a subordinate to begin assembling a transition team to implement the closure of LCF. In the past, Sprint had assembled such transition teams only after the decision to close a facility had been formally made. Mr. Meyer also informed Mr. Rosas, just one day before the July 6 meeting, that the board was considering closing LCF.
 
 
 15
 The July 6 meeting began with Sprint CSG President Schmieg stating that the decisions about to be made would be " 'based solely on the economic justification that is set forth in the financial documents.' " NLRB Decision at 5. At no time during the meeting was there any discussion of the union activity or the upcoming representation election.
 
 
 16
 The financial reports presented at the July 6 meeting demonstrated that LCF remained unprofitable and recommended that Sprint discontinue LCF's operations immediately. Indeed, LCF was now projected to lose approximately $4.5 million in 1994. While LCF did experience some slight financial improvements during its last three months, Sprint's financial experts argued that the resources necessary to achieve a LCF turnaround could be better utilized elsewhere in the corporation: Sprint's comparative investment study concluded that a dollar invested in Sprint's in-house Latino-oriented program would earn ninety cents in a year, while a dollar invested in LCF would lose thirty cents in the same period. The LCF board voted 5-0 (with Mr. Rosas abstaining) to close LCF, effective July 14. Shortly after this meeting, Sprint's transition team met to begin implementing the closure. They were instructed to keep their activities confidential and required to sign confidentiality agreements.
 
 
 17
 On July 14, eight days before the scheduled representation election, Mr. Rosas announced to LCF's employees that LCF was closing immediately due to financial difficulties. In a departure from its prior practice when closing other facilities covered under the Worker Adjustment and Retraining Act, 29 U.S.C. §§ 2101-2109 (1994), Sprint terminated the LCF employees immediately and gave them sixty days of wages and benefits, rather than providing the employees with sixty days of advance notice and requiring them to work during that period. Sprint rerouted all of LCF's incoming customer service calls to a Sprint customer service center in Dallas.
 
 
 18
 The ALJ credited both Sprint's evidence on LCF's financial decline and Sprint's testimony that it closed LCF solely for financial reasons. He rejected the opposing contention that the board decided at the May 6 meeting to keep LCF in operation indefinitely and also concluded that Sprint's activities after this meeting, including the hiring of Mr. Rosas, did not indicate an intent to continue operating LCF into the indefinite future. The ALJ further held that the board's July 6 decision to close LCF was a lawful exercise of its business judgment, despite recent indications that LCF's financial fortunes were improving slightly. In light of the evidence "that Sprint had valid and compelling economic reasons for closing LCF," the ALJ dismissed Mr. Doerr's misconduct in engineering a fabricated letter as "no more than an interesting but relatively insignificant event without much probative value." Moreover, he found "that only the confirmation letter was fabricated, and that Doerr did in fact have a conversation with an official of the outplacement firm relative to the possible closure of LCF well prior to any union activity." LCF, Inc. d/b/a La Conexion Familiar and Sprint Corporation (Aug. 30, 1995), reprinted in NLRB Decision at 28 (hereinafter "ALJ Decision"). Finally, the ALJ rejected the argument that the Sprint executives were being untruthful when they stated that the LCF board did not discuss union activity at either the May 6 or the July 6 meeting, finding "that placed in its appropriate context the Union situation at LCF was a matter of such incidental significance, when compared to the more pressing financial matters then confronting the board, that it is not implausible that the board members would be preoccupied with more immediate concerns." Id.
 
 
 19
 The NLRB reversed. In doing so, it stated that it "accept[ed] the [administrative law] judge's credibility resolutions," but not his "inferences drawn from the facts set forth in the credited testimony and documentary evidence." NLRB Decision at 7. The NLRB reasoned this way:
 
 
 20
 [T]he action of the [LCF] board on May 6--most notably the failure to adopt the recommendation for immediate closure while at the same time authorizing the hiring of Rosas--indicates that the board was inclined toward the option of keeping the business going for at least long enough to allow the turnaround initiatives to take hold. While an abrupt and dramatic change in the financial picture might likely have caused the board to vote, on July 6, for the immediate closure option rather than for any of the five strategic options identified at the May 6 meeting, no such change from the May forecasts appeared in the report presented in July....
 
 
 21
 [T]here was no compelling financial development that explains the July 6 vote for immediate closure. The lack of such evidence, together with the compelling evidence of antiunion motivation established in the General Counsel's prima facie case, leads logically to the inference that another, unspoken concern ultimately persuaded the board of directors to vote for LCF's immediate closure, i.e., the upcoming representation election with the likelihood of a union victory.
 
 
 22
 Id. at 8. The NLRB concluded that Mr. Schmieg's comment at the July 6 meeting that the board's decisions would be " 'based solely on the economic justification set forth in the financial documents' " indicated "an unexpressed agenda relating to the upcoming union election." Id. It also found revealing the fact that Sprint terminated the LCF employees just eight days before their representation election. Finally, it rejected the ALJ's finding that Mr. Doerr's fabricated letter recorded events that actually took place, finding insufficient evidence for that proposition.
 
 II. ANALYSIS
 
 23
 Terminating employees because of their union activity violates section 8(a)(3) and (1) of the National Labor Relations Act. See 29 U.S.C. § 158(a)(3), (1) (1994); Allegheny Ludlum Corp. v. NLRB, 104 F.3d 1354, 1367 (D.C.Cir.1997); Power Inc. v. NLRB, 40 F.3d 409, 417 (D.C.Cir.1994); Teamsters Local Union No. 171 v. NLRB, 863 F.2d 946, 955 (D.C.Cir.1988). Moreover, accelerating the timing of a management action that results in the termination of employees is also unlawful if done in response to union activity, even if the employer would have taken the same action at a later time. See Matson Terminals, Inc. v. NLRB, 114 F.3d 300, 303 (D.C.Cir.1997).
 
 
 24
 Under the framework that the Supreme Court approved in NLRB v. Transportation Management Corp., 462 U.S. 393, 399-403, 103 S.Ct. 2469, 2473-75, 76 L.Ed.2d 667 (1983), overruled in part on other grounds by Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 276-78, 114 S.Ct. 2251, 2257-58, 129 L.Ed.2d 221 (1994), the NLRB's General Counsel must first establish that protected union activity "was a substantial or motivating factor" in the employer's closure decision. If the General Counsel meets that burden, then the employer may present the "affirmative defense" that it would have closed its facility at the same time, even in the absence of protected union activity and the employer's antiunion motivation. Id. at 401, 103 S.Ct. at 2474 ("[T]he [NLRB]'s construction of the statute permits an employer to avoid being adjudicated a violator by showing what his actions would have been regardless of his forbidden motivation. It extends to the employer what the Board considers to be an affirmative defense but does not change or add to the elements of the unfair labor practice that the General Counsel has the burden of proving under § 10(c)."); see also Allegheny Ludlum, 104 F.3d at 1367.
 
 
 25
 This court's review of the NLRB's factual conclusions is highly deferential. We reject NLRB factual findings only if there is no substantial evidence in the record as a whole to support them. See, e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); Schaeff Inc. v. NLRB, 113 F.3d 264, 266 (D.C.Cir.1997); Gold Coast Restaurant Corp. v. NLRB, 995 F.2d 257, 263 (D.C.Cir.1993); Laro Maintenance Corp. v. NLRB, 56 F.3d 224, 228-29 (D.C.Cir.1995). " 'So long as the Board's findings are reasonable, they may not be displaced on review even if the court might have reached a different result had the matter been before it de novo.' " Laro Maintenance, 56 F.3d at 229 (quoting Clark & Wilkins Indus., Inc. v. NLRB, 887 F.2d 308, 312 (D.C.Cir.1989)). However, this court's analysis "consider[s] not only the evidence supporting the Board's decision but also 'whatever in the record fairly detracts from its weight.' " Schaeff, 113 F.3d at 266 (quoting Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464-65).
 
 
 26
 "The court's review of the Board's determination with respect to motive is even more deferential. Motive is a question of fact that may be inferred from direct or circumstantial evidence. In most cases only circumstantial evidence of motive is likely to be available. Drawing such inferences from the evidence to assess an employer's ... motive involves the experience of the Board, and consequently, the court gives substantial deference to inferences the Board has drawn from the facts, including inferences of impermissible motive." Laro Maintenance, 56 F.3d at 229 (internal citations omitted); see also Power, 40 F.3d at 418 ("[T]he NLRB may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.").
 
 
 27
 This case presents the question of whether there is substantial evidence to support the first prong of the Transportation Management Corp. test, i.e., NLRB's finding that antiunion animus "was a substantial or motivating factor" in Sprint's decision to close LCF. 462 U.S. at 401, 103 S.Ct. at 2474. Locating direct evidence of antiunion motivation in a plant closure is often impossible, and here the NLRB's General Counsel has acknowledgedly amassed some relevant circumstantial evidence pointing to such motivation. In particular, the illegal antiunion campaign that LCF officials conducted in the spring of 1994 is an important piece of evidence.
 
 
 28
 The NLRB found that Sprint had decided at the May 6 board meeting to keep LCF open indefinitely; since nothing significant happened between then and the July 6 meeting--except for the scheduling of a representation election and the emergence of evidence that union victory was likely--it inferred that the changing labor situation at LCF explained Sprint's new course. The NLRB's conclusion that Sprint acted out of antiunion animus, however, ultimately lacks substantial evidence in the record. Simply put, the enormous body of financial data and testimony recording LCF's extremely serious financial decline dominates the record and indicates that, as the ALJ concluded, "Sprint had valid and compelling economic reasons for closing LCF." ALJ Decision at 28.
 
 
 29
 Indeed, the ALJ's factual findings, based on fourteen days of hearings and voluminous documentary evidence, demonstrate that LCF's prospects were grim. By March 1994, Vice President Meyer's financial projections indicated that LCF would make $12 million less in 1994 than Sprint had expected, losing $4 million in the year rather than earning its anticipated $8 million annual profit. This "ominous forecast," id. at 13, was predicated on the basis of a number of troubling economic indicators. LCF's "churn rate," the percentage of its customer base lost each month, was 20.5% in January 1994, 18.5% in February, and 22.5% in March. In addition, LCF's telemarketers were unable to attract enough new customers to even keep the customer base stable. The rate of sales per hour for LCF's telemarketers declined by approximately 50% between January and March. By May, LCF was losing 1.41 customers for every customer that it was acquiring; LCF lost about 16,000 customers in May and June alone. By June 30, LCF's customer base had declined to about 85,000 customers, down from 130,000 in January. By July 14, when LCF closed its doors, LCF had just 76,532 customers.
 
 
 30
 This evidence of LCF's severe and continuing financial decline overwhelms the circumstances on which the NLRB relies. In fact, it renders NLRB's characterization of the May 6 meeting, which is the cornerstone of the NLRB's decision, implausible. The mere fact that the LCF board decided on May 6 to reconvene in sixty days after fully considering all of its options does not suggest, in light of all the other record evidence, that the board was then "inclined toward the option of keeping the business going for at least long enough to allow the turnaround initiatives to take hold" and only changed its collective mind at some point on or before July 6. NLRB Decision at 8. The decision to hire Mr. Rosas ultimately does not alter the tenor of this meeting. Sprint may have mistreated Mr. Rosas by hiring him and giving him the go-ahead to manage LCF for five weeks without telling him that the board was considering closing LCF. But one of Sprint's largest concerns about LCF was that its lack of a full-time, on-site manager required Vice President Meyer to devote approximately one day a week to a small, failing, and geographically distant part of the business under his jurisdiction. Moreover, if, as seems more natural, the May 6 board decision is read as a sign that the board was already seriously concerned about LCF, then the NLRB's focus on the lack of change in LCF's finances during the sixty days between the May meeting and the July meeting no longer makes sense: LCF may not have been losing money and customers at a faster rate between May and July, but it was surely plummeting downward on its unprofitable course.
 
 
 31
 Furthermore, Mr. Doerr's fabricated letter does not enable the NLRB to meet the substantial evidence requirement for its decision, given the weight of the other evidence in the record. There is no indication that Mr. Doerr acted in concert with anyone, or that his decision to create a false paper trail reflected anything but misguided overcautiousness. Cf. TIC--The Industrial Company Southeast, Inc. v. NLRB, 126 F.3d 334, 339 (D.C.Cir.1997) ("[T]he single, isolated comment that forms the entire basis for the alleged 8(a)(1) violation did not constitute substantial evidence of restraint, coercion, or interference with employees exercising protected rights under section 8(a)(1).").
 
 
 32
 Similarly, there is no evidence to support the contention that Mr. Schmieg's instructions to the LCF board at the July 6 meeting that it was to consider only the financial data were related to the upcoming union election.
 
 
 33
 Finally, the timing of Sprint's actions is not sufficient to compensate for the other evidentiary deficiencies in the NLRB's decision. To be sure, the LCF board voted twenty-two days before the scheduled representation election to close LCF. Sprint's further decision to dismiss the LCF employees immediately and pay them for sixty days, rather than giving the LCF employees advance notice and requiring them to work during that period, conveniently terminated the LCF employees just eight days before the representation election that CWA was expected to win. But the July 6 meeting had been planned since May 6, well before CWA filed its representation petition. Moreover, the General Counsel and CWA have put forth no evidence of antiunion animus in the days after July 6, except for the bare fact of Sprint's timing. Sprint, in turn, has articulated a number of legitimate business reasons for its decision to terminate the LCF employees immediately, including the recognition that there was no point in having the LCF telemarketers continue to sell a product that would no longer be available. In a stronger case, the timing of Sprint's actions, particularly after July 6, might have taken the General Counsel's case over the edge. But here timing is not enough to make an otherwise unpersuasive NLRB decision survive judicial scrutiny.
 
 III. CONCLUSION
 
 34
 The NLRB's decision ultimately lacks substantial evidence in the record given the overwhelming record evidence that LCF was in a serious and sustained financial decline throughout the months before its closure. For the foregoing reasons, we set the NLRB's order aside. In light of this decision, we need not reach Sprint's challenge to the remedy that the NLRB formulated.
 
 
 35
 So ordered.
 
 
 
 [1]
 There is some dispute about whether Mr. Doerr reviewed the minutes for the May 6 meeting, or the financial reports that Mr. Meyer presented at this meeting. Although the NLRB decision states that Mr. Doerr read the minutes, the ALJ found that Mr. Doerr had read Mr. Meyer's financial presentation