United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 12, 1998 Decided January 29, 1999 

 No. 97-1696

 Mathews Readymix, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 Roger K. Quillen argued the cause and filed the briefs for 
petitioner.

 Meredith L. Jason, Attorney, National Labor Relations 
Board, argued the cause for respondent. With her on the 
brief were Linda Sher, Associate General Counsel, John D. 


Burgoyne, Acting Deputy Associate General Counsel, and 
Charles Donnelly, Supervisory Attorney.

 David Rosenfeld was on the brief for amicus curiae General 
Teamsters, Professional, Health Care and Public Employees, 
Local 137, International Brotherhood of Teamsters, AFL-
CIO.

 Before: Ginsburg and Henderson, Circuit Judges, and 
Buckley, Senior Circuit Judge.

 Opinion for the Court filed by Circuit Judge Ginsburg:

 Ginsburg, Circuit Judge: In reliance upon decertification 
petitions signed by the employees it had hired as permanent 
replacements for strikers, Mathews Readymix, Inc. withdrew 
recognition from the union that had represented its work-
force. The National Labor Relations Board determined that 
Mathews violated ss 8(a)(1) and (5) of the National Labor 
Relations Act, 29 U.S.C. s 158(a)(1), (5), because an unreme-
died unfair labor practice tainted the petitions for decertifica-
tion. The Company petitions for review, arguing that sub-
stantial evidence does not support the Board's conclusion; the 
Board cross-applies for enforcement of its order. For the 
reasons set out below, we grant the petition for review and 
enforce only those portions of the Board's order that Math-
ews does not contest.

 I. Background

 Mathews is a California corporation engaged in the manu-
facture and distribution of ready-mix concrete. Until the 
events that culminated in this petition for review, it had a 30-
year history of collective bargaining with Local 137 of the 
International Brotherhood of Teamsters. The last collective 
bargaining agreement between Mathews and the Union ex-
pired on March 31, 1992 and the next day the Union began an 
economic strike in which all 41 bargaining unit employees 
joined. Mathews hired replacement employees and on April 
8 informed the Union that all the striking employees had 
been permanently replaced. During the hiring process 34 of 
the new hires had filled out a personnel form that asked, 

among other things, whether the potential employee was a 
member of a union and, if so, the name and address of that 
union.

 At least two of the replacement employees, Walter Scott 
Paul and Dave Roberts, drafted petitions to decertify the 
Union. At an April 11 safety meeting for Mathews' drivers, 
some of the replacement employees expressed to manage-
ment their concern that they would themselves be replaced 
when the strike ended. One of the drivers, David McCasland, 
asked management about the petitions for decertification, 
which Paul and Roberts had circulated during a break. The 
CEO of Mathews' parent corporation, Greg Dagnan, replied: 
"[I]t's not up to management .... It's none of [the Compa-
ny's] business as to how [the employees] sign or do not sign 
any petition." At the end of the safety meeting, Roberts 
received permission to hold a short meeting for employees 
only. At that meeting, Roberts informed those drivers who 
remained of his and Paul's petitions, which Roberts described 
as a way to "help us avoid anymore [sic] conflict with the 
striking Teamsters." A number of employees signed the 
petitions at that meeting.

 In the days following the April 11 meeting, the manager of 
one of Mathews' plants asked McCasland why he had not 
signed a petition. McCasland said that he would think about 
it and the next day did sign a petition. The manager then 
asked McCasland to approach two others, Ken Harris and 
Robin Magby, about signing a petition. At McCasland's 
request Harris signed a petition despite having already done 
so at the April 11 meeting. Magby refused to sign, stating 
that he "was looking to move into a management position" 
and "didn't feel it would be right" to sign.

 As of April 21, all but one (Magby) of the approximately 52 
replacement employees working for Mathews had signed a 
petition. On that date, the Company informed Local 137 that 
it had a good faith doubt that the Union continued to enjoy 
the support of a majority of the bargaining unit and that 
Mathews was therefore withdrawing its recognition of the 
Union as the exclusive representative of the employees.


 The Union filed unfair labor practice charges alleging that 
Mathews had unlawfully interrogated and solicited McCas-
land and refused to bargain with the Union. The Board 
issued a complaint, which the General Counsel amended 
during the hearing to include Mathews' use, as an application 
for employment, of the form asking about the applicants' 
union membership. The Administrative Law Judge issued 
findings and conclusions, holding that the inquiry into the 
union membership of applicants, and the manager's interroga-
tion of McCasland each violated s 8(a)(1) of the NLRA. 
According to the ALJ, the application form, when used during 
a strike, "may be considered to be coercive in nature, regard-
less of [Mathews'] motivation," which the ALJ found was 
benign. The ALJ also held that the solicitation of McCasland 
was "[c]learly ... coercive interrogation and unlawful inter-
ference with employees' rights to engage in or refrain from 
engaging in union activity," in violation of s 8(a)(1). The 
ALJ concluded, however, that neither of the violations tainted 
the signatures supporting decertification, except for McCas-
land's which he found was solicited by management, because 
"any causal connection between [the Company's] pre-
employment interrogation and the employees' willingness to 
sign a petition to decertify the Union was tenuous at best." 
Because the 51 signatures constituted a clear majority of the 
bargaining unit, the ALJ found that the Company had a good 
faith doubt about the Union's majority status and that its 
withdrawal of recognition did not violate ss 8(a)(1) and (5) of 
the NLRA.

 The General Counsel filed exceptions before the Board 
which four years later reversed the ALJ's decision in part by 
a 2-1 vote. Mathews defended the ALJ's conclusion that its 
withdrawal of recognition was not unlawful but did not con-
test either of the ALJ's unfair labor practice findings, which 
the Board of course affirmed. See Mathews Readymix, Inc., 
324 N.L.R.B. No. 152, at 5 (Nov. 7, 1997). Reversing the 
ALJ on the lawfulness of the withdrawal, the Board found 
that the coercive interrogation of "all of the replacement 
employees who completed the form" tainted the petitions for 
decertification. Id. at 3. The Board reasoned as follows:


 Given the [use of the application form to hire replace-
 ments for striking employees], we find it reasonable to 
 infer that the unlawful interrogation would cause employ-
 ees to become disaffected from the Union. The interro-
 gation was directed to approximately 34, or two-thirds, of 
 all of the employees who later signed the decertification 
 petition. Further, the interrogation occurred in connec-
 tion with the hiring process, thus employees could rea-
 sonably believe that their hire or retention was depen-
 dent upon their rejection of the Union. Finally, we note 
 the brevity of time between the unlawful interrogation 
 and the employees' ostensible rejection of the Union. 
 Id. at 4.

The Board responded to only one of Mathews' counterargu-
ments, stating that it was "not persuaded that the employees 
signed the petition because they were replacements." Id. at 
4-5 (emphasis in original). The Board then found that Math-
ews committed other s 8(a) violations in its dealings with the 
Union and with the replacement employees after it had 
withdrawn recognition.

 Member Higgins dissented in part, on the ground that 
there was no causal connection between the unlawful applica-
tion form and the decision of the employees to seek decertifi-
cation. Higgins emphasized three facts: "(1) the replace-
ments were not in the unit when the Union was selected ... ; 
(2) the replacements crossed the Union's picket line ... 
during the Union's strike; [and] (3) the replacements were 
concerned that they would be terminated when the strike 
ended." Id. at 7. Describing the Board's reliance upon the 
admittedly unlawful application form as a "legal fiction," 
Higgins noted that no replacement ever mentioned that form 
"before, during, or after the process of obtaining [the] signa-
tures"; he concluded that it was unreasonable to believe that 
the form "would, by itself, make the individual eager to prove 
... that he/she was antiunion." Id.

 II. Analysis

 In its petition for review, Mathews challenges the sufficien-
cy of the evidence supporting the Board's conclusion that the 

application form tainted the subsequent petitions for decertifi-
cation, as well as the Board's findings of post-withdrawal 
unfair labor practices and the related remedial orders. Al-
though the Board's findings of fact are conclusive if supported 
by substantial evidence, see Avecor, Inc. v. NLRB, 931 F.2d 
924, 928 (D.C. Cir. 1991), when the Board reverses an ALJ it 
"must make clear the basis of its disagreement." United 
Food & Commercial Workers Int'l Union, Local 152 v. 
NLRB, 768 F.2d 1463, 1470 (D.C. Cir. 1985). In reviewing 
the record for substantial evidence, "we consider not only the 
evidence supporting the Board's decision but also 'whatever 
in the record fairly detracts from its weight.' " Schaeff Inc. 
v. NLRB, 113 F.3d 264, 266 (D.C. Cir. 1997) (quoting Univer-
sal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). We 
are also mindful of the Supreme Court's recent teaching that 
when "the Board purports to be engaging in simple factfind-
ing, unconstrained by substantive presumptions or evidentia-
ry rules of exclusion, it is not free to prescribe what infer-
ences from the evidence it will accept and reject, but must 
draw all those inferences that the evidence fairly demands." 
Allentown Mack Sales & Serv. v. NLRB, 118 S.Ct. 818, 829 
(1998).

 A union enjoys an irrebuttable presumption of majority 
support while a collective bargaining agreement is in effect. 
After the agreement expires the presumption becomes rebut-
table and an employer may withdraw recognition if it can 
demonstrate that the union does not in fact enjoy majority 
support or if it has a good faith doubt that the union enjoys 
majority support. See Lee Lumber & Bldg. Material Corp. v. 
NLRB, 117 F.3d 1454, 1458 (D.C. Cir. 1997). A petition to 
decertify the union signed by a majority of the employees in 
the bargaining unit is ordinarily sufficient evidence to rebut 
the presumption of majority support; but if the General 
Counsel "comes forward with evidence to show that the 
union's decline in support was attributable to the employer's 
misconduct, the employer's good-faith defense to the with-
drawal of recognition will fail." Sullivan Indus. v. NLRB, 
957 F.2d 890, 898 (D.C. Cir. 1992).


 In this case, it is uncontested, on the one hand, that 
Mathews committed an unfair labor practice by using an 
employment application that inquired into the applicant's 
union membership, and on the other, that the petitions for 
decertification, if not attributable to the unfair labor practice, 
provided Mathews with a good faith doubt that the Union 
enjoyed majority support. In order to determine whether 
there was a causal relationship between the decertification 
petitions and the unremedied unfair labor practices, the 
Board considered the four factors that it had set forth in 
Master Slack Corp., 271 N.L.R.B. 78 (1984), and we had 
approved in Williams Enters., Inc. v. NLRB, 956 F.2d 1226, 
1236 (D.C. Cir. 1992):

 (1) The length of time between the unfair labor practices 
 and the employee petition; (2) the nature of the unfair 
 labor practices, including whether they are of a nature 
 that would cause a detrimental or lasting effect on the 
 employees; (3) the tendency of the unfair labor practices 
 to cause employee disaffection with the union; and (4) 
 the effect of the unlawful conduct on the employees' 
 morale, organizational activities, and membership in the 
 union.

Mathews concedes the unfair labor practice and the petitions 
were in essence contemporaneous: the petitions had been 
circulated and signed and recognition was withdrawn a mere 
11 days after it ceased using the application form. The 
Company argues, nonetheless, that the Board ignored evi-
dence tending to undermine its conclusion that the employees 
were, owing to the timing and context of the unlawful inquiry, 
"likely to have remembered the question regarding union 
membership on the personnel records form when they signed 
the petitions to decertify the Union." Mathews, 324 N.L.R.B. 
at 4. We must agree.

 First, as Mathews points out, the application form asked 
not only whether the potential employee was a union member 
but also, if so, for the union's name and address. Potential 
employees were not given any explanation for this request, 
but the most obvious inference is that the employer wanted to 


be able to send mail to the union. This innocuous inference is 
reinforced by the form as a whole, which is headed "EM-
PLOYEE TO COMPLETE PERSONNEL RECORDS" and 
contains blank spaces for the applicant's name, social security 
number, address, spouse's name, driver's license number, 
person to notify in case of emergency, and the offending 
information. This is not to quarrel with the Board's holding 
that, as a matter of law, the question constituted "coercive 
interrogation" in violation of s 8(a)(1). Mathews' point is 
only that nothing about the context in which the question 
appears draws attention to it or otherwise suggests that it 
would leave a memorable impression upon the applicant. 
And as the Board itself recognizes, more than a bare-bones 
violation of s 8(a)(1) is needed to support the inference that 
the employer's unlawful conduct may have influenced the 
employees to sign a petition to decertify the Union. Cf. 
General Indus. Employees Union, Local 42 v. NLRB, 951 
F.2d 1308, 1313 (D.C. Cir. 1991) (Board has decided "on 
several occasions that an unlawful practice not fully cured ... 
nevertheless was not, or had ceased to be, a reason underly-
ing a strike").

 Second, both Paul and Roberts, each of whom had complet-
ed the unlawful application form, initially hid from the Com-
pany their efforts to decertify the Union. Paul testified 
before the ALJ that "[m]anagement didn't know about [the 
petition]. And I felt that if they'd seen something passed 
around, they may grab it and see what it is." Roberts 
testified that he "was kind of sneaking around getting these 
signatures." The Board's speculation that the application 
form "would likely make [the employees] eager to prove to 
[Mathews] that they were free of any prounion sentiments" 
does not square with the actual attitudes of the employees 
who initiated the effort to decertify the Union; neither of 
them was eager even to let the Company know what he was 
up to, apparently because they were not at all confident that 
management would not disapprove of their anti-union activity.

 Third, the CEO of Mathews' parent company explicitly told 
a group including many of the eventual signatories that the 
petition drive was "none of [the Company's] business." Even 

if the unlawful question on the application form was on the 
employees' minds when they entered that meeting, therefore, 
any connection between the form and their subsequent deci-
sion to sign the petitions was surely severed by this state-
ment from the highest level of management.

 Fourth, the 17 replacement employees who never saw the 
unlawful application form, like the 34 employees who did, all 
signed a petition for decertification. The causal inference 
that the Board draws from the unanimity of those who filled 
out the form, therefore, is belied by the like unanimity of 
those who did not; both groups--the exposed group and the 
control group, as it were--equally and to the last man op-
posed continued representation by the Union.* The only fair 
and sensible inference is that there was no causal connection 
between the application form and the petitions.

 Finally, as the dissenting Board Member noted, those 
signing the petitions were replacement employees who had 
crossed the striking Union's picket line; some of them had 
openly expressed their fear that Mathews and the Union 
would ultimately come to terms that would include the termi-
nation of their employment. The Board need not, of course, 
adopt a presumption that replacement employees are anti-
union. See NLRB v. Curtin Matheson Scientific, Inc., 494 
U.S. 775, 791 (1989). Neither, however, may the Board 
ignore evidence that the replacement employees in a specific 
case, by virtue of their being replacements, are in fact 
opposed to the employer's continued recognition of the union. 
In this case, there was testimony before the ALJ that "[s]ome 
of the [employees] were nervous .... [and] wanted to know 
once the strike was over, would they be replaced." The only 
reasonable inference is that their expressed fear of being 

__________
 * The Board points to no evidence suggesting that those who did 
not see the form firsthand were nonetheless aware of the question 
about union membership or even of the manager's solicitation of 
McCasland, which the Board treats not as an independent source of 
taint, but merely as "conduct consistent with the antiunion atmo-
sphere created by [the application form] interrogation." Mathews, 
324 N.L.R.B. at 4.


discharged because they were replacements, not the unmen-
tioned but lingering effect of a question on the application for 
employment they had filled out, motivated them to sign the 
petitions.

 These five pieces of evidence, in combination, forcefully 
contradict the limited evidence upon which the Board relied 
in reaching its conclusion, namely, the employment applica-
tion itself and the short period between the time the replace-
ment employees filled out the application and the time they 
signed the petitions to decertify the Union. Considering all 
the evidence in the record, we think it apparent that substan-
tial evidence does not support the Board's finding that the 
application form tainted the petitions for decertification upon 
which Mathews based its good faith doubt of the Union's 
majority support.

 We need not go into the other s 8(a) violations the Board 
found Mathews committed after withdrawing recognition 
from the Union. All depend upon the withdrawal of recogni-
tion being unlawful; that predicate having been removed, 
they cannot stand.

 III. Conclusion

 For the foregoing reasons, Mathews' petition for review is 
granted and the Board's application for enforcement is grant-
ed only insofar as it remedies Mathews' uncontested pre-
withdrawal violations of s 8(a)(1).

 So ordered.